362 So.2d 744 (1978)
STATE of Louisiana
v.
Gilbert Feigado GUZMAN.
No. 61328.
Supreme Court of Louisiana.
September 5, 1978.
*746 Eugene P. Cicardo, Camille J. Giordano, Alexandria, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., Edward E. Roberts, Jr., Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
Gilbert Guzman was indicted for possession of heroin with intent to distribute, in violation of R.S. 40:966(A)(1). The original indictment charged defendant jointly with his wife, Alma Guzman, and Robert Rodriguez. On motion of defendants, a severance was granted and, on September 20, 1977, defendant proceeded to trial alone. On September 23, 1977 the jury found him guilty by an eleven to one vote. Subsequently he was sentenced to life imprisonment at hard labor.
On appeal, defendant relies upon seven assignments of error for reversal of his conviction and sentence.

Assignment of Error No. 1
In defendant's most serious assignment of error, he alleges that the warrantless search of the automobile which uncovered the heroin violated his constitutional right against unreasonable searches and seizures, and he argues that the trial judge erred in overruling the motion to suppress.
The heroin was seized about 10:00 o'clock at night on December 16, 1976 after the car in which defendant was a passenger was stopped by police about four miles north of Glenmora on Highway 165. The car was stopped because the police suspected it contained a pound of heroin in transit from San Antonio, Texas to Alexandria, Louisiana. The police had actually arranged for the delivery of the heroin seized and possessed substantial information concerning the shipment, but did not believe they knew enough to obtain a search warrant of the car based on probable cause. That belief was proved correct by the evidence, as well as their conclusion that suspicion ripened into probable cause when Guzman was identified as an occupant of the car.
What the police knew began with the July, 1976 vacation trip by Tom Bates, a communications worker employed by the Louisiana State Police. On his return from a camping trip in Texas, Bates reported to a police narcotics officer an encounter in San Antonio with one Joel Garcia, who offered to sell Bates marijuana, and expressed interest *747 in distributing drugs in Alexandria. When the first report failed to generate any activity, Bates told his story to Noel Hood Reed, a young State Police narcotics officer. Reed began to communicate, through Bates, with Garcia, who had given his phone number to Bates. Reed and Bates made two trips to San Antonio to purchase drugs, and on one trip bought two and one-half ounces of heroin from Garcia. Hood communicated with federal Drug Enforcement Administration officials in San Antonio.
In December of 1976 Garcia called Bates in Alexandria about selling a pound of heroin. Two bus tickets were sent to Garcia for him to come to Alexandria to make arrangements for the sale. Garcia came alone, however, bringing a very small quantity of what he said was a sample of the heroin. Garcia and Reed both purported to represent undisclosed principals. $16,000 in cash was displayed to Garcia, who then called his man in San Antonio, identified by him as "Mr. G." or "Gene." When the deal was about closed, Garcia's principal told him to send, to demonstrate good faith, $200.00 by Western Union in San Antonio, payable to Gilbert Guzman. This demand aroused suspicions in Reed that the police involvement had been discovered. Reed told Garcia the deal was off, and that he would escort Garcia to the bus station to return to San Antonio. Reed and Garcia then left Bates' apartment; instead of taking Garcia to the bus station, Reed took him to the police station where Garcia was booked.
During this time, "Gene" from San Antonio called Bates' apartment for Garcia; Bates told "Gene" the deal was off because of the $200.00 demand; "Gene" asked Bates to intercept Garcia at the bus station and await another call from "Gene" at 7:00 o'clock. At 7:00 o'clock, "Gene" called again, and Bates convinced him that Garcia was out of the apartment for a brief time. "Gene" responded that the demand for the $200.00 advance was abandoned and that "they" would leave San Antonio around noon the next day and drive to Alexandria to consummate the transaction. Garcia had previously indicated that "Gene" would probably be accompanied by "Uncle," an older Mexican male with silver hair.
On the morning of December 16 Reed contacted special agent Rudy Gonzales of the Drug Enforcement Administration, told him the situation, and sought any information he might have on Gilbert Guzman. Gonzales surmised (his reasons are not explained) that the sellers would probably be driving either a late model silver 2-door Chevrolet coupe or a blue 1972 Lincoln with a white top. Gonzales did not have license plate numbers, but knew that both cars had Texas plates and that license numbers issued in the San Antonio area began with an "E." Additionally, Gonzales was able to supply a description of both Guzman and "Uncle."
On the afternoon of December 16 Reed and other officers set up surveillance at the intersection of Highways 113 and 165 in Glenmora, Louisiana, believing this to be the most likely route for travelers from San Antonio to Alexandria. Reed and Trooper Burnes, the driver, were positioned on the shoulder of the intersection at Glenmora's only traffic light. At about 10:00 p. m., a silver 2-door Chevrolet coupe stopped at the traffic light. The officers observed a driver and a passenger in the front seat who fit the descriptions they had been given. When the car subsequently proceeded through the green light, they noticed that it had a Texas license plate with an "E" as the first letter.
Burnes and Reed followed the suspects for several miles without a siren or flasher in order to allow the positioning of other police vehicles. About four miles north of Glenmora, they pulled the Chevrolet over to the shoulder of the road, parking their own marked police vehicle somewhat behind it. Fixing the Chevrolet in their spotlight, they noticed a third passenger, a woman, in the back seat. The driver of the Chevrolet hurried back to meet Burnes at the front of the police car and presented him with a California driver's license identifying him as one Robert Rodriguez. At Reed's direction *748 the male passenger, the defendant, got out of the vehicle; Reed addressed defendant as "Mr. Guzman" and told him to move to the front of the car and produce his driver's license, which confirmed his identification. Finally, the woman got out, was identified as defendant's wife, Alma, and all were patted down and given a reading of Miranda rights.
Without seeking permission, the officers then searched the car. Taking the keys from the ignition, they opened the trunk but found nothing there. In the back seat they found a woman's purse. They opened it and found a small amount of marijuana. When the woman identified the purse as hers, she was placed under arrest for possession of marijuana. They continued their search of the car and found a one pound packet of grayish powder inside a brown paper sack taped under the dashboard on the passenger side. The powder was shown to be heroin by a field test. All three were then arrested for possession of heroin with intent to distribute. Reed testified that none of those arrested had ever been free to leave after the car was stopped.
It is well established that warrantless searches and seizures are per se unreasonable under the Fourth Amendment of the United States Constitution and Article 1, § 5 of the Louisiana Constitution of 1974, unless they fall within a limited number of well delineated exceptions to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Parker, La., 355 So.2d 900 (1978); State v. Lain, La., 347 So.2d 167 (1977).
The only applicable exception has been termed the "automobile emergency exception" outlined in the United States Supreme Court case of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In Carroll the court recognized a distinction:
". . . between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." 267 U.S. at 153, 45 S.Ct. at 285, 69 L.Ed. at 551.
Carroll, and subsequent United States Supreme Court cases, made clear that a warrantless search of an automobile may be justified by necessity arising out of the mobility and imminent disappearance of the vehicle. See Coolidge v. New Hampshire, supra; Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The cases set out two conditions that must be satisfied before a warrantless search of a movable vehicle is authorized: (1) there must be probable cause to believe that the vehicle contained contraband or evidence of a crime; and (2) there must be "exigent circumstances" requiring an immediate warrantless search, i. e., the impracticability of obtaining a warrant due to the possibility that the car could be moved either by its occupants, if not arrested, or by someone else. An immediate warrantless search is, therefore, constitutionally permissible when "the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." Chambers v. Maroney, supra, 399 U.S. at 51, 90 S.Ct. at 1981, 26 L.Ed.2d at 428.
Defendant initially contends that the police officers had no probable cause to stop the vehicle. Alternatively he alleges that if probable cause were present, the police had ample opportunity to present the facts to a neutral magistrate in order to obtain a search warrant before bringing on the encounter.
The police officers had certain information for several hours before the stop: (1) an unidentified person had told Bates by phone that heroin was to be brought to Alexandria by car leaving San Antonio at an approximate time; (2) at one point in the negotiations money was to be wired to an individual named Gilbert Guzman; and (3) Drug Enforcement Administration agents told Reed that one of two vehicles *749 with a license plate starting with an "E" would be used, a silver Chevrolet or blue Lincoln, and provided general descriptions of two men who would probably occupy the car, one of whom would be Gilbert Guzman, a known narcotics violator. Nonetheless, this information would not have been sufficient for a magistrate to find probable cause for a search. See State v. Hearn, La., 340 So.2d 1365 (1976). See also State v. Tant, La., 287 So.2d 458 (1974). The reliability of the identification of the suspected automobiles could not be supported by Reed; the identification of the automobiles was not specific; the route to be traveled and the arrival time were unknown.
Although the police could not have given a magistrate sufficient information to establish probable cause to search silver Chevrolets or blue Lincolns with Texas license plates probably beginning with "E," the minute Noel Hood Reed saw Guzman and "Uncle" at the highway intersection in Glenmora, the suspicion which was the product of negotiations with Garcia, telephone conversations with "Gene," surmises from some known facts and from inductive and deductive reasoning, became almost certain facts. It was far beyond a probability that the police saw a serious crimethe importation of a pound of heroin. Probable cause and exigent circumstances coincided, satisfying the requirements of the "automobile emergency exception" to the warrant requirement.
Defendant next argues that even if probable cause to search was present, there was lacking the exigent circumstances required to enable the police officers to search without first obtaining a search warrant. He alleges that, once the occupants of the vehicle were removed and detained by the police, no evidence could have been removed or destroyed. In essence, he suggests that the police officers should have seized the car and held it while seeking out a magistrate's approval for a search.
There is substantial merit in the contention that police must obtain a search warrant for an automobile when they can do so without jeopardizing the contraband sought, but neither this court nor the United States Supreme Court has made that requirement. Although a search may be a greater intrusion into privacy than the sequestration, immobilization, impoundment or detention of the thing to be searched, and although a detached magistrate should be better able than the police to decide whether probable cause to search exists, the sequestration is itself a seizure. The validity of both seizures and searches is measured by the same constitutional standards. It would require an extension of constitutional law to permit the police to seize without a warrant, and then forbid them to search the thing seized unless a warrant is first obtained.
"For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." Chambers v. Maroney, supra, 399 U.S. at 52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428.
See also State v. McQueen, La., 278 So.2d 114 (1973).
Defendant further contends that even if the warrantless search was constitutionally valid under the "automobile emergency exception," the police officers had no authority to break open the seal of the taped brown paper bag located under the dashboard in which was found the plastic bag of heroin. Defendant relies on United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and not without some justification, because of the explanation in that opinion. There, after tracing a footlocker full of marijuana from a train station in San Diego to one in Boston, and then into an automobile, the police seized it and opened it without a warrant. The court found the search to be invalid because "[b]y placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would be free from public examination." 97 S.Ct. at 2483.
*750 If the defendant's expectation of privacy determined the issue here, Guzman might go free. To say that Guzman did not expect, nor at least fervently hope for privacy for his paper sack with its pound of heroin would be to ignore facts. This court will probably not be the first to hold that what police can lawfully search for and seize without a warrant cannot be examined without a warrant. The Chadwick case essentially decided that the "automobile emergency exception" did not apply to Chadwick's footlocker and did not eliminate the necessity for a search warrant.
Therefore, we hold that the warrantless search, conducted with probable cause and under exigent circumstances, was reasonable within the contemplation of our state and federal constitutions.

Other Assignments of Error
No. 2. Defendant does not allege, nor does the record show, that he was prejudiced by the State's late response on September 13, 1977, to the motion for bill of particulars. All necessary information for defendant to prepare adequately his defense was available after the hearing on the motion to suppress on July 22, 1977 where the State virtually laid out its entire case. Therefore, the trial court was correct in denying defendant's motion to quash on those grounds. Defendant's alternative allegation in the motion to quash, that he was not brought before a judge for the purpose of appointment of counsel within one hundred forty-four hours of his arrest, as required by C.Cr.P. 230.1, is likewise without merit. Subsection (D) of that article specifically provides that: "The failure of the sheriff to comply with the requirements herein shall have no effect whatsoever upon the validity of the proceedings thereafter against the defendant." See also State v. Brown, La., 322 So.2d 211 (1975).
No. 3. No reversible error was committed when Joel Garcia was asked by the prosecutor, ". . . approximately how long prior to December of 1976 did you work for Mr. Guzman in the distribution of drugs?" Assuming without deciding that same was a prohibited reference to another crime by defendant for which evidence is not admissible, defendant was not prejudiced by the remark, and the trial judge correctly overruled the motion for mistrial. There was no request for an admonition. The jury had already been exposed to the fact that Garcia had previously sold drugs for defendant by testimony introduced without objection earlier in the direct examination of this witness. Finally, the prosecutor withdrew his question about the relationship between Guzman and Garcia, limiting the inquiry to the pound of heroin here involved.
No. 4. No error was committed by admitting into evidence the incriminating heroin. A continuous uninterrupted chain of custody is not essential to enable the State to introduce physical evidence as long as the evidence as a whole establishes that it is more probable than not that the objects introduced were those purchased from the defendant. "Once this prerequisite for its admissibility is met, doubts as to the positive identification present a jury issue as to the sufficiency of the evidence, leaving it to the trier of fact to determine whether the weight of the evidence does or does not prove the identity of the objects introduced with those sold by the defendants." State v. Lewis, La., 354 So.2d 566 at 568 (1978).
No. 5. Defendant contends the trial court erred in sustaining the State's objection to the following question propounded to defendant about a statement made by his co-accused: "Did Robert Rodriguez tell you anything?" Defense counsel's articulated reason to the trial judge for allowing defendant to answer the question was that the statement would not be hearsay because not offered to show the truth of the matter asserted. In brief, however, he abandons that argument, instead alleging that the testimony should have been allowed because it was pertinent. Neither the trial record nor defendant's brief disclose the nature of the information sought, nor the reason for its relevance. There was no error in the trial judge's ruling.
*751 No. 6. There was no error in the trial judge's refusal to read defendant's four special requested jury charges. The substance of all was included in the general charge. C.Cr.P. 807.
No. 7. Defendant contends the State exceeded the bounds of rebuttal in closing argument. In rebuttal the prosecutor referred to Bates' telephone number found in Guzman's address book. The State had referred to it in first closing argument; the defense did not mention the item in closing argument, and, therefore, the objection should have been sustained. However, the prosecutor's mention in rebuttal of an item of damaging evidence which had already been forcefully presented to the jury is not cause for reversal.
For these reasons, defendant's conviction and sentence are affirmed.