384 So.2d 370 (1980)
STATE of Louisiana
v.
Leon and Annie Lee JOLLA.
Nos. 66638, 66724.
Supreme Court of Louisiana.
May 19, 1980.
Rehearing Denied June 23, 1980.
*371 Anthony J. Marabella, Jr., App. Counsel, Alton T. Moran, Director, Baton Rouge, for defendants-relators in No. 66724 and for defendant-respondent in No. 66638.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., J. Michael McDonald, Kay Kirkpatrick, Asst. Dist. Attys., for plaintiff-respondent in No. 66724 and for plaintiff-relator in No. 66638.
DENNIS, Justice.[*]
We granted both the defendants' and the state's applications for writs of review to consider the trial judge's pretrial rulings on the defendants' motions to suppress inculpatory statements and evidence in connection with this prosecution for two counts of cruelty to juveniles. The trial judge suppressed inculpatory statements made by defendants at their house prior to their arrest and others made at the station house following the Jollas' arrests; but he refused to suppress evidence obtained pursuant to a warrantless search of the Jollas' house. We find that the judge erred in suppressing the statements. The statements at the Jollas' house were not made in response to custodial interrogation and the station house statements were made after defendants were advised of their Constitutional rights. The judge, on the other hand, properly denied the motion to suppress the evidence taken at the Jollas' house, because the Jollas consented to the investigatory search.
FACTS
A case worker, Ms. Maggiore, for the Baton Rouge Child Protection Center received a complaint from an unidentified member of the Jolla family on May 28, 1979. The informant told her that Mr. and Mrs. Jolla, a middle-aged couple with sixteen children, were keeping a pair of sevenyear old twins in total isolation. The informant described the conditions in which the twins lived as being deplorable, with the twins being severely malnourished and in need of medical attention.
Ms. Maggiore was skeptical of the truth of the report, but, pursuant to routine procedure, she called the Baton Rouge sheriff's office to obtain assistance. She spoke to Lieutenant McCastle, who happened to know the Jollas personally, and he drove Ms. Maggiore out to the Jolla residence to investigate the complaint. Lieutenant McCastle was likewise incredulous, for he had known the Jollas and their children but was not aware of the existence of sevenyear old twins.
Ms. Jolla answered the door at her home and invited the officer and Ms. Maggiore inside. The lieutenant advised Ms. Jolla of the nature of the visit and asked if she had seven-year old twins in the house. She said that she did but that they were asleep. The officer then changed the subject briefly, inquiring about some of the other children in a friendly manner. After this exchange, the officer asked Ms. Jolla if he could see the twins, but she refused, saying that they were asleep and that he should return the next day if he wanted to see them. He told her he just wanted "to peep in on them" and promised not to disturb their sleep. Ms. Jolla expressed her reluctance to let him do this, but following a few more requests *372 by the officer, she relented and agreed that he could see the children. However, she said that her husband would have to approve of the officer's entry into the room.
Ms. Jolla went down the hall to get Mr. Jolla out of another part of the house. He came into the kitchen and was told by Lieutenant McCastle that a complaint had been received concerning the seven-year old twins and he wanted to see the children. Mr. Jolla told him that he should come back another day to see the children. The lieutenant expressed his desire to see the children without delay. He further told Mr. Jolla that he had a right to refuse permission to go back into the bedroom to see the twins, but if he refused, a search warrant might be obtained. Lieutenant McCastle, still speaking to the Jollas in a calm tone of voice, informed Mr. Jolla that he would rather see the children without a search warrant so as to "do it as peaceful as possible." At this, Mr. Jolla offered to bring the children out of the room so that the officer could see them. McCastle reiterated his desire to see them inside their room. Mr. Jolla then shook his head and stated that the officer could go into the room.
Mr. Jolla led the lieutenant down the hallway to the twins' bedroom. At the door, however, he had a change of heart. He told McCastle that the twins were inside the room, but the officer would not be able to go inside because the room was "filthy." McCastle again gently expressed his wish to peer into the room without disturbance and Mr. Jolla finally acquiesced. While McCastle opened the door to the room, Mr. Jolla dropped his head, walked outside the house, and sat under the carport.
The lieutenant found the twins in the bedroom in a state of desolation. They appeared to have been confined for a long period of time, seemed severely malnourished, and filth covered the floor. He called for assistance, and when Deputy Wright arrived, the Jollas were placed under arrest for cruelty to juveniles. Deputy Wright advised them of their Miranda rights at their arrest but no further statements were taken until a few hours later at the station. There, McCastle and Wright advised the defendants of their rights again, then took a taped statement from the Jollas.
The defendants moved to suppress the evidence taken from the home, including pictures of the scene of the twins' bedroom. They moved to suppress all the statements they made to Lieutenant McCastle during his questioning of them before he went into the twins' room and the statements taped later at the police station. The trial judge found that the Jollas consented to the search of the house and therefore the warrantless search was lawful. He decided to suppress all the statements, however, because the officer should have given the Jollas their Miranda rights when he entered the house; and that the taped statements at the station were tainted by the earlier questioning.
SUPPRESSION OF THE EVIDENCE
The search of the Jollas' house which produced the evidence of the conditions under which the twins lived was made without a warrant. A warrantless search, unless it falls within one of the specifically delineated exceptions, is per se unreasonable under the Fourth and Fourteenth Amendments to the Constitution. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Guzman, 362 So.2d 744 (La.1978). One of the specifically delineated exceptions to the warrant requirement is a search conducted after the defendant has consented voluntarily to the search. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The state has the burden to show that the consent was in fact voluntarily given, with voluntariness to be determined from all the circumstances surrounding the incident. Schneckloth, supra; State v. Carthan, 377 So.2d 308 (La.1979).
We find that the trial judge did not abuse his discretion in holding that the state met its burden of showing that the Jollas consented to the search of the twins' bedroom. In examining the circumstances *373 of Lieutenant McCastle's investigation prior to his entry into the room, we find that the atmosphere was non-coercive. The Jollas were neither under arrest nor detained when they consented to the search. When the lieutenant spoke with Ms. Jolla in the kitchen, Mr. Jolla was in another part of the house and the officer was unconcerned about his whereabouts. Even after Mr. Jolla assented to the officer's entry into the room, he was free to, and did in fact, leave the house.
Lieutenant McCastle knew the Jollas personally. Ms. Jolla let Ms. Maggiore and him into her home freely and voluntarily, and the record suggests no compulsion. The officer at one point, after informing Ms. Jolla of the nature of his visit, asked about the well-being of some of the other children with whom he was personally acquainted.
The defense argues that the Jollas acquiesced to a claim of lawful authority and therefore their consent is invalid. See Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). However, this argument lacks merit in view of the circumstances of this search. The officer never engaged in unfair ruses to obtain the Jollas' consent nor did he assert any authority to enter the room without their consent and without a search warrant. He informed the Jollas' initially of the nature of his visit, of the complaint he had received; he told them that he could get a warrant (which he had a lawful right to seek) but that he would prefer to have their consent to search in order to avoid the compulsive remedy of a search warrant. He made it clear to both of the Jollas that they did not have to let him into the room, that they lawfully could refuse permission.
We cannot consider the officer's persistent requests as indicative of coercion. The Jollas never told Lieutenant McCastle to leave their house firmly and categorically. The lieutenant, in repeating his requests to see the twins, did not exploit his position as a police officer to overcome the Jollas' will. Lieutenant McCastle exercised a concerned but non-coercive investigation of a complaint involving people he knew personally. Throughout the questioning he was calm and straightforward with the Jollas and ultimately he succeeded in convincing them that, although they had a right to tell him to leave, it was in the best interests of the twins and themselves that they allow him to enter the bedroom.
The trial judge correctly sustained the search of the house on the basis of free and voluntary consent.
SUPPRESSION OF THE STATEMENTS
The defense asserts, and the trial judge agreed, that all the statements made during the investigation from the time the officer entered the house to the arrests should be suppressed because no Miranda warnings were given. Although it is not clear whether anything the Jollas said during this period was inculpatory, we will treat the statements as evidence against the Jollas for the sake of our examination here. The trial judge suppressed the taped statements made by the Jollas at the police station as being tainted by the earlier, inadmissible statements.
We find that there was no necessity for Miranda warnings prior to the discovery of the twins' living conditions. When an accused has not been taken into custody or otherwise deprived of his freedom of action in any significant way, there is no requirement that a police officer give the Miranda warnings prior to his questioning. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Corey, 339 So.2d 804 (La.1976); State v. Roach, 322 So.2d 222 (La.1975). Miranda applies only when an accused is subjected to "custodial interrogation," i. e., when he has been taken into "custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, supra, 86 S.Ct. 1602, 1612; State v. Yates, 357 So.2d 541 (La.1978). It is clear that the Jollas were not in custody and their freedom of movement was not restricted in any significant manner. Ms. Jolla let the officer into her home because she knew him *374 personally, not because she was compelled to do so. Lieutenant McCastle gave the Jollas no indication that he would not let them leave the house; and in fact, Mr. Jolla did leave the house after the deputy went into the twins' bedroom, when he went outside to sit under the carport. Furthermore, until McCastle saw the twins in the room, he had no probable cause to believe a crime was being committed. The questioning was conducted in a non-custodial setting.
Given the admissibility of the earlier statements, we find that the trial judge erroneously concluded that the taped statements taken at the station were tainted. Cf., Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Jollas were arrested at their residence shortly after the twins were found in the room. Deputy Wright arrived and gave the Jollas their oral Miranda rights. At the station, the deputy again gave the Miranda warnings and the Jollas signed a waiver form. When the Lieutenant McCastle arrived a short while later, the Jollas received Miranda yet a third time and signed another waiver form, then gave the taped statements. During this period at the station, the Jollas were not handcuffed, nor were they confined to a cell. They were in the interview room free, as Deputy Wright testified, to walk around the station. We find that the Jollas effectively waived their Miranda rights and freely made the taped statements.
The defense argues, finally, that the Jollas had such a reduced mental capacity that they could not intelligently waive Miranda. At the motion to suppress the defense submitted evidence that the Jollas each had an intelligence quotient of 67 on the Wechsler Adult Intelligence Scale. The psychological report, however, indicated that the Jollas, although below normal in intelligence, did not suffer from any mental disorders. Ms. Jolla had completed the tenth grade and Mr. Jolla, the eighth. Mr. Jolla has maintained regular employment as a carpenter, supporting his family. The evidence does not indicate that the Jollas were incapable of understanding and waiving Miranda. See State v. Collins, 370 So.2d 533 (La.1979). We find that the Jollas understood and freely waived their rights and gave a voluntary statement at the station.
For the foregoing reasons, we reverse the trial judge's suppression of the statements and affirm his denial of the defense motion to suppress the evidence.
REVERSED in part;
AFFIRMED in part.
NOTES
[*] The Honorable RICHARD H. GAUTHIER participated in this decision as an Associated Justice Pro Tempore.