441 So.2d 249 (1983)
STATE of Louisiana
v.
Kenneth LeCOMPTE, John LaGrange, Pedro Rodrigues, and John M. Hirschler.
No. KA-0663.
Court of Appeal of Louisiana, Fourth Circuit.
October 6, 1983.
Rehearing Denied December 21, 1983.
Writ Denied March 9, 1984.
*251 Hy Shapiro, Miami, Fla., and Frank G. DeSalvo, New Orleans, for appellants.
Harry Connick, Dist. Atty., William Campbell, Jr. and John F. Craft, Asst. Dist. Atty., New Orleans, for appellee.
Before GARRISON, LOBRANO and GULOTTA, JJ.
LOBRANO, Judge.
The defendants, Kenneth LeCompte, John LaGrange, Pedro Rodrigues and John M. Hirschler were charged by bill of information with the unlawful possession of 16,000 *252 pounds of marijuana, a violation of LSA-R.S. 40:966(E). This bill was filed by the State after the United States District Court, Eastern District of Louisiana, granted a directed verdict acquitting all of the defendants of violations of 21 U.S.C.A. Sec. 841(a)(1) and 18 U.S.C.A. Sec. 2 allegedly the same crime charged in the present case.
At their arraignment on June 2, 1980, each defendant entered a plea of not guilty, and each filed a Motion to Suppress evidence and a Motion to Quash based on Collateral Estoppel and Double Jeopardy. After an evidentiary hearing, both motions were denied by the trial court. Thereafter, on June 9th, each defendant entered a plea of guilty to the crime charged, and specifically reserved his right to appeal the pre-trial rulings under the holding in State v. Crosby, 338 So.2d 584 (La.1976). Each defendant was sentenced to 15 years at hard labor. However the court vacated the minimum mandatory terms pursuant to LSA-R.S. 40:966(D)(2), and sentenced LeCompte to five (5) years imprisonment. That sentence was suspended and the defendant was placed on five (5) years active probation. As a special condition of probation, he was ordered to pay a five thousand ($5,000) dollar fine to the Criminal District Court Operations Fund and serve one (1) year in the Orleans Parish Prison. The defendants, Hirschler and LaGrange, were sentenced to five (5) years at hard labor. That sentence also was suspended and each defendant was placed on five (5) years active probation with two special conditions: (1) each was to serve one (1) year in Orleans Parish Prison; and (2) each defendant pay a fine of fifteen thousand ($15,000) dollars to the Criminal District Court Operators Fund.
FACTS:
In early June of 1979, a confidential informant, Russell Janke, advised agents of the Drug Enforcement Administration (DEA) that he had personal knowledge of 35,000 pounds of marijuana stored in a warehouse on Tchoupitoulas Street in New Orleans. Janke stated that he made two deliveries of marijuana from this warehouse on June 15, 1979, and that the warehouse was leased to a person named "Ken". He gave no description of "Ken" nor did he know his last name. After a one hour search with DEA agents, Janke located the warehouse at 3715 Tchoupitoulas Street. Periodic surveillance was then conducted on the warehouse. Agent Molyneux was the agent in charge of the operation and he attempted to corroborate some of the information provided by Janke. During his investigation, Molyneux discovered that this warehouse had been leased to Kenneth Le-Compte several months before.[1] Further investigation corroborated other information provided by Janke, i.e., hotels that Janke had stayed in; the service station where Janke stopped for diesel fuel when making deliveries of marijuana and information regarding "T-Bone", a person involved in previous deliveries. As a result of the surveillance, a registration check was performed on approximately 25 to 30 vehicles seen at this warehouse. A photograph file was compiled from the drivers' license photographs of the owners of these vehicles. From these photographs, Janke picked out several individuals that he stated were involved in the June deliveries of marijuana. One of these individuals was Kenneth Le-Compte.
Continued surveillance of the Tchoupitoulas Street warehouse revealed no criminal activity. Molyneux maintained his contact with Janke, meeting him seven times and speaking with him over the telephone numerous times during the course of the investigation. In August or September, Janke told Molyneux that Jerry Earnest, the person who drove the truck during the June 15th deliveries, had informed him that there were 75,000 pounds of marijuana in the Tchoupitoulas Street warehouse which had come from a vessel named "Nooderkron", found scuttled in the Gulf of Mexico. In mid-November, Janke informed Molyneux that "another load was imminent" prompting a twenty four hour a day surveillance of the Tchoupitoulas Street warehouse. A video camera was erected which *253 relayed a picture to DEA headquarters at 1001 Howard Avenue in New Orleans where all activity was monitored. During the surveillance, the agents' witnessed several individuals travelling from the Tchoupitoulas warehouse to a warehouse located at 1926-1928 Rousseau Street in New Orleans.[2] LeCompte and Hirschler were identified as two of the persons moving between the two warehouses and an automobile registration check revealed that the owner of the Rousseau Street warehouse, John Hollis, was observed at both warehouses. A video camera, similar to the one erected at Tchoupitoulas Street, was installed so that the activity around the Rousseau Street warehouse could be monitored on a twenty four hour a day basis. The following activity was observed by DEA agents: On several occasions, Agent Molyneux observed a truck at the Tchoupitoulas Street warehouse which had K & G Trucking painted on the cab. Later, this same truck was observed entering the Rousseau Street warehouse where it was painted a different color, the license plate was changed and another company name, "B & H Trucking", was painted on the side. A check revealed that those companies did not exist. Molyneux was not sure when this activity was observed, however, he was certain it was within three or four weeks prior to the arrest of the defendants.
On November 8, 1979, a tractor trailer carrying two containers used for shipping cargo, was followed as it left the Rousseau Street warehouse and proceeded along the River Road toward Sorrento, Louisiana. Near Burnside, Louisiana, the containers were loaded off the truck by a hoist and placed on a barge pushed by a tug named "General Lee". From this point, surveillance was conducted from a Coast Guard Cutter, a DEA vessel, a United States Custom Department aircraft and a DEA aircraft. The barge was followed down the Mississippi River, and on November 15,1979 entered the Gulf of Mexico near Breton Sound where a transmission, "Where are you located?" was intercepted by the Coast Guard. The reply to that question was not intercepted and after approximately one hour, the barge went back up the River where surveillance of the barge was lost near the Harvey Locks. The following day, Molyneux spoke with Janke who was confident that the load of marijuana would be delivered even though Jerry Ernest told Janke that his brother Homer (a main suspect in the investigation) felt "like they were being watched". No other suspicious activity was observed at either warehouses from December 1, to December 11,1979, the date of the arrests. On that date, at approximately 3:30 p.m., a recreational vehicle and several pick up trucks were seen exiting the Rousseau Street warehouse. Prior to their exit, a man came out of the warehouse and looked up and down the street. The DEA agents were unable to follow these vehicles because of rush hour traffic and mechanical problems. Shortly thereafter, two U-Haul trucks entered the warehouse. At approximately 5:00 p.m., one of the U-Haul trucks exited the warehouse. Three DEA agents followed the truck down St. Charles Avenue where it entered Interstate Highway 40 west bound toward Kenner, Louisiana. The agents followed the truck to Williams Blvd. (approximately 15 miles) at which time the decision was made to stop the truck after it was ascertained that Kenneth LeCompte, a subject of the investigation was the driver. The truck had not violated any traffic laws while being followed by the agents.
Agent Chase, (who was in command due to Molyneux's absence), used his blue lights and siren to force the truck to the side of the road. One DEA vehicle pulled in front of the truck, one in back and one alongside between the truck and the highway. Eight agents approached the truck with their guns drawn and pointed at LeCompte. Le-Compte was ordered out of the truck, patted down, searched and advised of his Miranda rights. In response to Chase's questions, *254 LeCompte stated he didn't know what was in the truck and said, "Well, I was told to bring it up to New Orleans and park it on a side street and come back a short period of time later and pick it up, and I was bringing it out here to Kenner." Le-Compte denied leaving the warehouse with the truck. When Chase asked permission to search the truck, LeCompte stated, "Yeah, I don't have anything to hide. You can go ahead and search. It's not my truck." However, LeCompte did not have the key to unlock the padlock on the rear of the truck. Chase called the DEA office and requested that Agent Cazenavette bring a pair of bolt cutters to the scene.
Agent Woodfork arrived shortly thereafter with a pair of bolt cutters. Agent Cazenavette arrived about one hour later and brought a "Consent to Search" form which LeCompte refused to sign. LeCompte also rescinded his prior consent to search the truck.[3] Nevertheless, the agents cut the padlock and found 39 bales of marijuana (2,000 pounds) on the bed of the truck. There was testimony that Agent Woodfork smelled marijuana prior to cutting the padlock on the truck.[4] The agents then placed LeCompte under arrest for possession of marijuana.
Later, the agents prepared an application for a search warrant for the Rousseau Street warehouse. Suspicious activity in connection with the warehouse continued. Telephone installation information had previously been obtained by the agents as to the telephone located at the Rousseau Street warehouse. At 11:00 p.m., Molyneux made a phone call to this number. The person who answered identified himself as George and stated he did not know LeCompte. Later, Molyneux made a second call and asked the location of the person answering the phone. The person responded that he was speaking from a friend's house. No mention was made of the warehouse. Subsequent to the second phone call, Agent Woodfork saw the warehouse door open and a large U-Haul truck stood facing out onto the street with its motor running. Defendants LaGrange, Hirschler and Rodriguez were seated in the cab of the truck. Earlier that evening Agent Woodfork had smelled marijuana from under the door of the warehouse as well as observing sparks coming from under the roll-up door. Woodfork and Cazenavette, believing that the defendants were about to leave the premises, yelled "Federal Agents" and advised the defendant to come out of the truck. These facts were included in the search warrant application which was presented to the magistrate at approximately 12:30 a.m.
The defendants were placed under arrest and the warehouse secured until the search warrant was signed. Agent Cazenavette found two containers of marijuana on the bed of an eighteen wheel truck in the back of the warehouse. One container was open and Cazenavette could see marijuana debris scattered inside. The other container was padlocked. There is conflict in the testimony as to when a search of the second container occurred.[5] The search of the trucks and the warehouse revealed approximately 14,000 pounds of marijuana. The testimony is clear that Agents Chase and Molyneux both knew that the search had already occurred when they approached the Magistrate with the warrant application.[6] Neither informed *255 the Magistrate that the search of the warehouse had already occured or that the defendants were in the custody of the DEA agents.
ERRORS PATENT AND SUFFICIENCY OF EVIDENCE:
We have reviewed this record both as to errors patent and for sufficiency of evidence. As to errors patent we find none. As to sufficiency of evidence we find that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found in this case that the essential elements of the crime of possession of marijuana LSA-R.S. 40:966(E) were proved beyond a reasonable doubt. State v. Walker, 369 So.2d 1345 (La.1979); State v. Edwards, 354 So.2d 1322 (La.1978); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);State v. Edwards, 400 So.2d 1370 (La.1981); State v. Baker, 338 So.2d 1372 (La.1976);State v. Alford, 323 So.2d 788 (La.1975).
ASSIGNMENT OF ERROR I.
Defendants assert that the District Court erred by denying the defendant's Motion to Suppress Tangible Evidence. This assignment of error is divided into the following four subsections:
A. The arrest of the Defendant Le-Compte and subsequent search of his truck was without probable cause and, therefore, in violation of the Defendant's right to be free from unlawful searches and seizures guaranteed by the Fourth Amendment of the United States Constitution and Article 1, Section 5 of the Louisiana Constitution.
B. The illegal search of the LeCompte truck tainted the probable cause necessary for both the warrantless entry into the Rousseau Street warehouse and the subsequent search warrant for the warehouse.
C. The agents did not have probable cause to arrest the defendants in the warehouse; therefore, any evidence obtained incident to this arrest must be suppressed, including evidence of their presence in the Rousseau Street warehouse.
D. The agents' search and seizure of the Rousseau Street warehouse which preceded the issuance of the search warrant rendered the entire search of the warehouse unlawful.
A.
An arrest must be based on probable cause. The standards that apply in determining probable cause for a warrantless arrest are the same as those necessary for obtaining a valid arrest warrant. State v. Elliot, 407 So.2d 659 (La.1981); State v. Nieto, 395 So.2d 733 (La.1981). Probable cause exists when the facts and circumstances within the arresting officer's knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949);State v. Elliot, supra; State v. Herbert, 351 So.2d 434 (La.1977). It is to be judged by the probabilities and practical consideration of everyday life on which average men, particularly average police officers, can be expected to act. State v. Smith, supra.
The law is clear that while the officer need not have sufficient proof to convict, mere suspicion is not enough to justify an arrest. State v. Herbert, supra. Furthermore, the circumstances upon which the arresting officers act must show that criminal conduct is more probable than non-criminal activity. Equivocal conduct does not afford probable cause to arrest, where the possibility of criminal conduct is no greater than the possibility of innocent behavior. State v. Herbert, supra; State v. Thomas and Talbert, 349 So.2d 270 (La. *256 1977). In circumstances where the arresting officers or agents do not know for certain that a crime has been committed, more and better evidence is needed to establish probable cause.State v. Hunter, 375 So.2d 99 (La.1979). The determination of the existence or lack thereof of probable cause is a substantive determination to be made by the trial judge from the facts and circumstances of the case. State v. Nicholas, 397 So.2d 1308 (La.1981), citing Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The trial judge's conclusion as to the existence of probable cause are entitled to great weight. State v. Drott, 412 So.2d 984 (La.1982).
The crucial question presented by this assignment of error is whether the trial judge had sufficient facts and circumstances to determine that the arresting officers had probable cause to believe Kenneth Le-Compte was committing or had committed a crime when he was arrested on December 11, 1979. There is no question that Le-Compte was arrested, not merely detained, when his truck was forced onto the shoulder of the highway. He was surrounded by DEA vehicles and was ordered out of the truck by eight DEA agents with their guns drawn and pointed at him. United States v. Ceballos, 654 F.2d 177 (2nd Cir.1981); State v. Zielman, 384 So.2d 359 (La.1980).
LeCompte was also fully searched and read his Miranda rights prior to the search of the truck and prior to Agent Woodfork smelling the marijuana from the rear of the truck. Thus, the arrest and search cannot be justified on the basis of LeCompte's false statements and the odor of marijuana escaping from the truck. The question now follows whether there was probable cause for the agents to arrest Le-Compte at the moment they stopped him.
Much of the information relied on by the DEA in establishing the probable cause to arrest LeCompte and search the truck was provided by the confidential informant, Russell Janke. Even though Molyneux was the person in contact with the confidential informant but was not present when Le-Compte was arrested, he testified that all of the information he received from Janke was documented on DEA reports and was revealed to Agents Chase and Cazenavette and to other agents as well. Molyneux remained in contact with Janke throughout the investigation. He met with him seven times and spoke to him on the telephone on numerous occasions. Janke stated that he had been involved with the prior marijuana deliveries in June; had personally delivered 35,000 pounds of marijuana and had observed additional marijuana being stored in the warehouse on Tchoupitoulas Street. The additional information supplied by Janke originated with Jerry and Homer Earnest and were not based on any personal knowledge of Janke.
Hearsay statements of a confidential informant are not ipso facto unreliable. Although much of Janke's information was hearsay, it was corroborated by the DEA investigation and the DEA believed the information to be reliable because he had cooperated with the FBI and IRS on previous occasions which culminated in arrests and convictions.
A finding of probable cause may be based on hearsay information received from a confidential informant. State v. Ragsdale, 381 So.2d 492 (La.1980); State v. Paciera, 290 So.2d 681 (La.1974); State v. St. Hill, 433 So.2d 395 (La.App. 4th Cir. 1983). The informer's information however, must first be measured against the criteria established by Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).[7] If the information is found to be *257 inadequate under Aguilar, then any independent observation by the investigating officer which corroborate the information supplied by the informer should be considered. Aguilar is a two-prong test, consisting of (1) the "veracity" test and (2) the "basis of knowledge" test.
The "veracity" test is met when the officer states that the informant has supplied information which has led to arrests and convictions in the past. State v. Nieto, supra; State v. Gilbert, 354 So.2d 508 (La. 1978). In the instant case the "veracity test is satisfied" as Janke had provided reliable information to other law enforcement agencies in the past.
The "basis of knowledge" test presents a more difficult problem. In State v. Paciera, supra, the court stated:
"Factors which support the credibility of the information reported include (a) direct personal observation by the informant, or (b) if the information came indirectly to the informant, the reasons in sufficient factual detail for the magistrate to evaluate and credit the reliability both of the indirect source and of the indirectly-obtained information." Paciera, at 686.
The information supplied by Janke concerning his personal observations satisfies the "basis of knowledge" test, Aguilar, supra; State v. Elliot, 407 So.2d 659 (La.1981). However, the information which came indirectly to Janke through Jerry and Homer Earnest does not. Nevertheless, probable cause to arrest and/or search may still be established by corroborating facts. This brings us to the question of whether the agent's independent observations permitted "the suspicion engendered by the informant's report to ripen into a judgment that a crime was probably being committed". Spinelli v. United States, 393 U.S. 416, 89 S.Ct. 584 (1969). In State v. Tate, 407 So.2d 1133,1137 (La.1981), the Louisiana Supreme Court stated:
"An informant's tip can be significantly buttressed if either independent observations by the affiant corroborate sufficient details of the tip (whether suspicious or not) to negate the possibility that the informant fabricated his report, or independent observations by the affiant contribute to a showing of probable cause by revealing not merely normal patterns of activity but activity that reasonably arouses suspicion."
The agents' surveillance of the warehouses revealed suspicious activities which would tend to corroborate Janke's reports that an on-going drug smuggling operation was being conducted. In mid-November of 1979, a tractor trailer truck carrying two shipping containers was followed from the warehouse on Rousseau Street to Burnside, Louisiana where the containers were off-loaded onto a barge. Molyneux testified that this was the same method employed in previous drug smuggling operations. Also in mid to late November, a truck was repainted in the Rousseau Street warehouse and its license plate changed. The names on the side of the truck, "K & G Trucking and B & H Trucking", were investigated and there was no record that these companies were in existence or had ever existed. The agents also observed that both of the warehouses were being frequented by the same people. The DEA believed that the warehouse on Rousseau Street was owned by the same group of people.[8] In fact, the DEA observed that the majority of the activity was being transferred to the warehouse on Rousseau Street and after mid-November the investigation focused on this location. In addition, several of the people who frequented the warehouse, including LeCompte,[9] were known to have been involved *258 in the prior smuggling operations and, according to Janke, were part of the same organization that was planning to deliver another shipment of marijuana to the Tchoupitoulas Street warehouse. The DEA had already established that LeCompte was one of the drivers in the June smuggling operation[10] and had been the lessee of the warehouse on Tchoupitoulas Street. John Hollis, the owner of the warehouse on Rousseau Street, was also seen frequenting the Tchoupitoulas Street warehouse.
We agree with the defendants that throughout this five month investigation, no marijuana was actually observed by the DEA agents at either warehouse nor did Janke supply any information concerning the warehouse on Rousseau Street. No trucks were seen being driven between the two warehouses which might indicate that the marijuana seen by Janke on Tchoupitoulas Street was being transferred to Rousseau Street. However, all the facts, circumstances and observations of the agents taken as a whole would lead a reasonable man to believe that it was more probable than not that the warehouses were being used in an on-going drug smuggling operation. When the three pick-up trucks exited the warehouse followed by a U-Haul truck driven by LeCompte, a known drug smuggler, it was more probable than not that LeCompte was engaged in criminal activity, given all the other information and observations by the DEA. Thus, the agents had probable cause to arrest Kenneth Le-Compte, when he drove the U-Haul truck out of the Rousseau Street warehouse. B.
Since we have determined that the trial judge was correct in his finding that probable cause existed to arrest LeCompte, the subsequent search of the rear portion of the truck was justified under the "automobile emergency exception" to the warrant requirement. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Based on Carroll and it's progeny, the Louisiana Supreme Court in State v. Guzman, 362 So.2d 744 (La.1978) set out the two conditions that must be satisfied before a warrantless search of a vehicle is authorized:
"(1) there must be probable cause to believe that the vehicle contained contraband or evidence of a crime; and (2) there must be `exigent circumstances' requiring an immediate warrantless search, i.e., the impracticability of obtaining a warrant due to the possibility that the car could be moved either by its occupants, if not arrested, or by someone else. An immediate warrantless search is, therefore, constitutionally permissible when `the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.' Chambers v. Maroney, supra, 399 U.S. at 51, 90 S.Ct. at 1981, 26 L.Ed.2d at 428" Guzman at 748.
In the instant case, the agents, based upon their ongoing surveillance of the defendant and the information received from the informant, arrested the defendant and searched the entire vehicle, including the rear container section. Any portion of a vehicle may be searched when probable cause exists to search the vehicle. State v. Cunningham, 412 So.2d 1329 (La.1982); State v. Hernandez, 408 So.2d 911 (La.1981). The facts in Cunningham and Hernandez are very similar to the present case. Probable cause was established by the detailed tip from a reliable informant and independant corroboration of that information by police surveillance. In addition, the police were also faced with exigent circumstances requiring that they either seize and hold the vehicle before presenting the probable cause issue to a magistrate or conduct an immediate search of the vehicle without a *259 warrant. In Hernandez, the Louisiana Supreme Court stated:
"For constitutional purposes, given probable cause, it was reasonable for the officers to immediately search the inherently mobile conveyance rather than merely to immobilize it." State v. Hernandez, supra, at 914.
Here, the arrest of LeCompte and search of the truck took place on an interstate highway. It was impractical for the officers to get an arrest warrant since Le-Compte may have escaped while waiting for the warrant. It would also have been impractical to obtain a search warrant under the circumstances. LeCompte could have disposed of the evidence, it could have been secreted away or lost.
C.
Defendants assert that the agents did not have probable cause to arrest LaGrange, Rodriguez and Hirschler inside the Rousseau Street warehouse and that any evidence obtained incident to these arrests must be suppressed. The same principles set forth above regarding warrantless arrests and searches also apply to this issue.
The agents testified that while they were watching the warehouse on the night of December 11, 1979, they smelled marijuana from under the open door at approximately 6:00 p.m. The agents by this time knew that the U-Haul truck which LeCompte drove out of the warehouse at 5:00 p.m. contained 2,000 pounds of marijuana. The agents were also aware of all of the information received by the prior surveillance. At 11:30 p.m. when the door of the warehouse opened and a tractor trailer truck waiting behind the door was facing the street with its engine running, the agents had probable cause to believe that a crime was being committed and that it was more probable than not that the truck contained contraband. Exigent circumstances existed as it was clear that the departure of the truck was imminent. Thus, the agents acted properly in preventing the truck from leaving and in arresting the occupants of the warehouse without waiting to secure a warrant. State v. Dupuis, 378 So.2d 934 (La.1979).
D.
The testimony regarding the search of the remainder of the warehouse is conflicting. The DEA agents claimed that they only did a cursory search to determine if any other persons were in the warehouse while waiting for the search warrant to be signed. They testified that only after the search warrant was signed did they make a thorough search of the warehouse. Defendant LaGrange testified that the agents searched the entire warehouse, including the closed container, within five minutes after entering the warehouse which, if true, would have occurred prior to the warrant being signed at 12:30 a.m. This conflict was resolved by the trial judge in favor of the DEA agents. His decision is supported by the facts in the record and is not manifestly erroneous or an abuse of discretion. "Credibility of witnesses is a matter in which the trial judge's discretion is broad, and it is a matter concerning which he is particularly well situated to judge." State v. Collins, 328 So.2d 674, 677 (La.1976).
This assignment of error lacks merit.
ASSIGNMENT OF ERROR 2
Defendants contend that the trial court erred in denying their Motion to Quash based on double jeopardy and collateral estoppel.
Louisiana is one of approximately twenty-seven jurisdictions in the United States which recognize the general view that a state prosecution following a federal prosecution for criminal acts arising from the same transaction does not place the defendant in double jeopardy in violation of his constitutional rights since the federal and state governments are separate sovereigns, each of which may subject the defendant to punishment for an infraction of its own laws. In State v. Smith, 359 So.2d 160 (La.1978) [citing State v. Forbes, 348 So.2d 983 (La.1977); State v. de la Beckwith, 344 So.2d 360 (La.1977)], the Louisiana Supreme Court restated its position that a subsequent state prosecution of *260 defendants on a similar charge for which they were prosecuted in federal court is constitutionally permissible under both Federal and State Constitution. The court further held that the state prosecution was not barred by collateral estoppel:
"The doctrine of collateral estoppel simply means that, when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. The doctrine is embodied in the double jeopardy guarantee of the fifth amendment." Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). "Since the first prosecution was in federal court, identity of parties, an essential requirement of collateral estoppel is lacking." State v. de La Beckwith, supra. Smiths, supra at 163.
This assignment of error lacks merit.[11]
For the foregoing reasons, the ruling of the trial court denying defendant's Motions to Suppress Tangible Evidence and Motion to Quash Based on Double Jeopardy and Collateral Estoppel is affirmed.
AFFIRMED.
NOTES
[1] LeCompte had since requested the lease be given to the present lessee, Charles Clay.
[2] The testimony is unclear as to which agent witnessed the movement between the two locations. Although Molyneux states that this activity occured in November, his later testimony indicates that at least some of the movement took place at an earlier time.
[3] Chase initially testified that LeCompte did not expressly refuse to allow the agents to search, however, he corrected his testimony when presented with the transcript from Federal Court wherein he testified that LeCompte stated "I am not going to give you consent to search the truck".
[4] Woodfork did not testify that he smelled marijuana outside the truck. Only Chase testified that Woodfork smelled the marijuana prior to the search but after LeCompte had been searched and read his rights.
[5] Both agents testified that the search took place only after the warrant was signed by Magistrate Livaudais at 12:30 a.m. Defendant LaGrange testified that the agents searched the padlocked container at about 11:45 p.m., fifteen minutes after entering the warehouse.
[6] Initially Agent Molyneux denied that he knew the search had taken place when he went to Magistrate Livaudais' residence and Agent Chase testified that he was unsure. However, when presented with the transcript from the Federal Court trial, they corrected their respective accounts of the events and testified that they did, in fact, know this prior to requesting the warrant.
[7] The rigid tests of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969) were swept aside by the recent U.S. Supreme Court case of Illinois v. Gates, ___ U.S. ___, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), decided June 8, 1983. In that case, the Court adopted a more flexible "totality of the circumstances" test. This is a very practical, non technical method of determining probable cause which depends on the facts and circumstances in a given case. Since we find probable cause under the Aguilar test, it is not necessary to decide whether Gates is retroactive. We must comment, however, that probable cause would exist under that test also.
[8] Janke knew that the persons leaving the warehouse on Tchoupitoulas Street also owned or leased three or four other warehouses in the New Orleans area. Janke was aware that one warehouse was located near Moisant Airport but did not know where the others were located.
[9] LeCompte had been involved with a shipment of hashish in 1974 and was well known to DEA agents.
[10] Janke had selected LeCompte's photograph from the file complied from the driver's licenses of owners of vehicles seen at the Tchoupitoulas Street warehouse. Although this fact was not testified to at the hearing, it was included in the application for the search warrant.
[11] We are duty bound to follow the decisions of our Supreme Court, and apply the law as set forth in those decisions. However, I must express my personal view that were the issue of double jeopardy "res nova" before this court, I would be of the opinion that the Federal prosecution constitutes the jeopardy contemplated by the Fifth Amendment.