453 So.2d 1202 (1984)
STATE of Louisiana
v.
Michael OWEN and Gregory Cormier.
No. 83-KK-2375.
Supreme Court of Louisiana.
June 25, 1984.
*1203 Jim Orteog, Lloyd Keith Milam, Lake Charles, for relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Leonard Knapp, Jr., Dist. Atty., Robert R. Bryant, Eugene Bouquet, Asst. Dist. Attys., for respondent.
MARCUS, Justice.
Michael J. Owen and Gregory Cormier were charged by the grand jury in the same indictment in separate counts with attempted second degree murder in violation of La.R.S. 14:27 and La.R.S. 14:30.1, aggravated crime against nature in violation of La.R.S. 14:89.1(2) and armed robbery in violation of La.R.S. 14:64. Prior to trial, defendants filed motions to suppress physical evidence. After a hearing, the trial judge denied the motions. The court of appeal denied writs. We granted defendants' application and remanded the case to the court of appeal for briefing and argument.[1] On remand, the court of appeal, finding that the trial judge correctly denied the motions to suppress, again denied writs.[2] Upon defendants' application, we granted certiorari to review the correctness of that ruling.[3]
Defendants contend the trial judge erred in denying their motions to suppress physical evidence seized pursuant to a warrantless search of a residence owned by a third person. They argue that they have standing to contest the legality of the search and that, on the merits, there was no valid consent to the warrantless search.

FACTS
Evidence adduced at the suppression hearing reveals that Lt. Pat McCann of the Sulpher Police Department received a call at about 1:30 a.m. on October 14, 1982 reporting a crime earlier that evening. When Lt. McCann arrived at the crime scene, he noticed that the front door of the house had been broken into and that there was blood all over the front room. It appeared to him that there had been a struggle and that someone had gone through the drawers and cabinets. According to the victim's son, who relayed information from the victim in her hospital room to Lt. McCann at the scene of the crime, the victim had been beaten, stabbed, sexually assaulted and robbed by two men. Money and coins, including old silver coins, were taken. The victim identified one of the perpetrators as Michael Owen and stated that he "was, at one time, staying with Carl Evans on North Crocker Street in Sulpher."
Lt. McCann dispatched Officer Keith Johnson to Evans' residence on North Crocker Street to attempt to discover information about Owen from Evans. Officer Johnson arrived at Evans' residence, a trailer located about five blocks from the scene of the crime, at about 2:35 a.m. He saw someone looking out of the window of the trailer as he pulled up. Soon after he arrived, the lights in the trailer went off. He knocked on the front door. Although he heard movement inside, no one answered his knock. Officer Johnson radioed this information to Lt. Ronnie Lee Carroll, who was then instructed by Lt. McCann to assist Officer Johnson at Evans' trailer. When Lt. Carroll arrived, he also knocked on the door, identified himself as a police officer and asked to speak to Carl Evans. There was no response. Lt. Carroll consulted with Lt. McCann at the crime scene about how to proceed and was told to return to the trailer, try again to rouse Evans, *1204 and, if unsuccessful, step inside. Upon returning to the trailer, Lt. Carroll knocked once more and then opened the unlocked front door. Following Lt. Carroll into the trailer were Officer Johnson, Auxiliary Officer Keith Berry and an unidentified deputy sheriff. This entry was made at about 3:00 a.m.
There are conflicting accounts about what occurred inside the trailer. Lt. Carroll and Officer Johnson testified that they walked about five or six steps into the trailer and observed two persons sleeping in the front room, later identified as Owen and Cormier. They recognized Owen because they were familiar with him from previous encounters. A third person, Grant Miller, was walking down the hallway toward them. Lt. Carroll told Miller to get Evans, the owner of the trailer. When Evans arrived, Lt. Carroll told him that they were investigating an armed robbery and stabbing and that Owen was one of the suspects. Lt. Carroll asked Evans if he would consent to a search of his trailer. Evans agreed and signed a consent to search form. Although the consent form has the time 3:45 a.m. written on it, Lts. Carroll and McCann testified that it was signed before Lt. McCann's 3:44 a.m. arrival at the trailer. After the consent form was signed, the five occupants of the trailer and the four police officers waited in the front room for Lt. McCann to arrive. There was very little conversation. According to Lt. Carroll, the officers were questioned about why they were there and replied that they were investigating an armed robbery and stabbing. No one was handcuffed; no search was made; and, no one was placed under arrest. When Lt. McCann arrived, he went over the signed consent form with Evans, told him what they were investigating and that he did not have to sign. He also asked Evans if the signature on the form was his, to which Evans replied that it was and that he still agreed to the search. A thorough search of the trailer was conducted. Numerous coins, including old silver coins, and prescription bottles with the victim's name on them were recovered. Defendants were arrested after the discovery of this evidence.
Two occupants of the trailer, Grant Miller and John Church, testified for defendants. Miller stated the police officers told them to stand up against the wall and empty their pockets. The coins were seized and everyone was questioned about his whereabouts that night. Initially, Miller stated that everyone in the trailer was arrested after McCann arrived; however, he later stated that everyone was handcuffed before McCann arrived. Similarly, Miller first stated that he did not see Evans sign the consent form; however, he later testified that Evans signed the consent form after everyone was handcuffed and being taken to the police cars. Miller also conceded that he was unsure when everyone was told to empty his pockets. Finally, on cross-examination, Miller admitted that he was "mixed up about the whole thing. It's been four months ago."
Church testified that he was awakened by a police officer and taken into the front room where he was read his rights and handcuffed. Everyone sat on the couch and chairs until he was told to get up. The police officers found the coins under the cushions. The occupants of the trailer were arrested and taken outside. According to Church, Evans signed the consent form in the kitchen when everyone else was being taken outside to the police cars.
Neither the state nor defendants were able to obtain Carl Evans' testimony; he was working offshore at the time of the hearing. At the conclusion of the testimony, the trial judge denied the motions to suppress. On remand from this court to consider defendants' application for writs after briefing and argument, the court of appeal held that defendants lacked standing under either the federal or state constitutions and that, in any event, Evans validly consented to the search.

STANDING
The question is whether defendants, for whom no arrest warrant had been issued, *1205 have standing to contest the admissibility of evidence seized in the search of Evans' trailer allegedly conducted in violation of Evans' constitutional rights. The federal jurisprudential rule is that one has standing only if the search or seizure allegedly violated the defendant's own constitutional rights; and, the defendant's fourth amendment rights are violated only when the challenged conduct invaded the defendant's reasonable expectation of privacy rather than that of a third person. United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). However, under La. Const. art. 1, § 5[4] as interpreted by this court, "any person adversely affected" by a search or seizure allegedly conducted in violation of art. 1, § 5 has standing to raise that illegality. There is no equivalent under Louisiana constitutional law to the federal rule that one may not raise the violation of a third person's constitutional rights. State v. Hebert, 351 So.2d 434 (La.1977) (on rehearing); State v. Culotta, 343 So.2d 977 (La.1976).
In the instant case, the search of Evans' trailer allegedly was conducted in violation of Evans' constitutional rights. Defendants would be adversely affected by this alleged illegality by the use against them at trial of evidence seized in the challenged search. Hence, although defendants do not have standing under the fourth amendment absent a showing of a reasonable expectation of privacy in the area searched, they have standing under La. Const. art. 1, § 5 to contest the admissibility of this evidence. The court of appeal's reliance on State v. Barrett, 408 So.2d 903 (La.1981), for its holding that defendants do not have standing under either the federal or state constitutions is misplaced. In Barrett, we held the defendant in that case was not "adversely affected" by the alleged unlawful entry into a third person's house to arrest Barrett so as to require suppression of evidence seized incidental to his arrest. Paramount in our consideration was that Barrett was the subject of an outstanding arrest warrant. We reasoned that since the arrest warrant was sufficient under Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), to enter into and arrest Barrett in his own house, he was not entitled to greater protection from arrest in a third person's house. However, the rationale of Barrett is inapplicable to the facts of the instant case because there was no arrest warrant extant against defendants. Therefore, defendants have standing under La. Const. art. 1, § 5 as persons adversely affected by an alleged unconstitutional search and seizure to challenge the admissibility of the evidence seized.

ADMISSIBILITY OF THE EVIDENCE
Defendants contend the evidence seized from Evans' trailer was obtained in violation of Evans' constitutional rights since Evans did not validly consent to the warrantless search of his trailer. Hence, this evidence is inadmissible for use against them at trial.
Unreasonable searches and seizures are prohibited by La. Const. art. 1, § 5.[5] It is well settled that a search conducted *1206 without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions. State v. Barrett, supra; State v. Bourgeois, 388 So.2d 359 (La.1980). One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent. When the state seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving the consent was given freely and voluntarily. State v. Ossey, 446 So.2d 280 (La.1984); State v. Wolfe, 398 So.2d 1117 (La.1981). In addition, if the consent was obtained after an illegal detention or entry, the consent was valid only if it was the product of a free will and not the result of an exploitation of the previous illegality. Among the factors considered in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the police officers adequately informed the individual that he need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct. State v. Zielman, 384 So.2d 359 (La.1980); State v. Bennett, 383 So.2d 1236 (La.1980) (on rehearing); State v. Ragsdale, 381 So.2d 492 (La.1980).
The state introduced in evidence Evans' signed consent to search form. In addition, Evans gave an oral consent to search on two occasions, one to Lt. Carroll shortly after the entry and another to Lt. McCann about forty-five minutes later. Both police officers testified that Evans was informed several times of the purpose of the search, that Owen was the focus of the investigation and that Evans did not have to comply with their request. There is no evidence of threats, coercion or promises. According to the officers, Evans was cooperative and willingly agreed to the search after being fully informed of its purpose and his right to refuse. There was no contrary testimony from defendants' witnesses; neither Miller nor Church provided any information about the voluntariness of the consent. Evans did not testify. Hence, the state clearly met its burden of proving that Evans' consent was free and voluntary.
Next, we must consider whether, in view of the alleged illegal entry,[6] Evans' consent was a product of his free will rather than an exploitation of the previous illegality. The first factor in this analysis is whether the police officers adequately informed Evans that he could refuse the request to search his trailer. It is clear that both Lts. Carroll and McCann independently informed Evans of his right to refuse to allow the search. Hence, Evans was adequately informed of this right. The second factor is the temporal proximity of the illegality and the consent. Evans orally consented to the search very soon after the illegal entry and again about forty-five minutes later. Although the precise time is unclear, the written consent form was signed by Evans sometime between the two oral consents. These time periods weigh against a finding of attenuation. Even the final oral consent, given forty-five minutes after the illegal entry, is too close in time to the unlawful entry. The third factor is whether there were any intervening circumstances between the illegal entry and Evans' consent. Soon after the entry, Lt. Carroll informed Evans that they were investigating a violent crime allegedly committed by Owen. Evans was informed that he was not a suspect and that Owen was the focus of the investigation. Finally, he was told that the requested search was for items taken from the scene of the crime by Owen. When Lt. McCann arrived, he also *1207 told Evans basically the same thing. This information, twice given to Evans about forty-five minutes apart, constitutes a relevant intervening circumstance tending to break the causal connection between the illegal entry and the consent. By the time Evans consented to the search, he knew the illegal entry and subsequent search were not directed against him.
The final factor is the purpose and flagrancy of the official misconduct. Although any violation of a citizen's constitutional rights by police officers is not to be condoned, the issue is, considering the purpose and flagrancy of the illegality, whether there is a close causal connection between the official misconduct and the subsequent consent. The police officers in this case made a warrantless entry into Evans' trailer without consent. The purpose of the unlawful entry, clearly conveyed to Evans by the officers, was to ascertain information about a suspect (Owen) who had just committed a violent crime and who was reported to have once stayed in the trailer. The entry was not made to arrest or detain Evans. It was made merely to obtain information about a wanted and presumably violent suspect. Hence, when Evans consented to the search, he knew that the focus of the police investigation at the time of the prior illegal entry was not him but, instead, was Owen. Moreover, the official misconduct, the warrantless entry,[7] was not very flagrant. Admittedly, the illegal entry was made at 3:00 a.m., an objectionable hour for an intrusion. But, the manner in which the entry was made was innocuous. After three unsuccessful attempts to arouse Evans by knocking on the front door, the police officers merely opened the unlocked door and walked in. The door was not broken down, the officers did not rush in as if it were a raid and no guns were drawn. Therefore, considering Evans' knowledge of the purpose of the entry and the manner in which it was made, the official misconduct had an insignificant effect on the subsequent consent.
In conclusion, we find Evans' consent was free and voluntary. Additionally, although there was a close temporal proximity between the illegal entry and Evans' consent, the other three factors consideredwhether the police officers adequately informed Evans of his right to refuse, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the illegal entrylead to a finding that Evans' consent was a product of a free will. Hence, since Evans validly consented to the search of his trailer, the items seized pursuant to this search were not obtained in violation of Evans' constitutional rights. Accordingly, the trial judge correctly denied defendants' motions to suppress.

DECREE
For the reasons assigned, the ruling of the trial judge denying the motions to suppress is affirmed and the case is remanded to the district court for further proceedings.
LEMMON, J., concurs and assigns reasons.
DIXON, C.J., concurs in part and dissents in part and assigns reasons.
CALOGERO, J., dissents.
*1208 LEMMON, Justice, concurring.
While I agree that Evans' consent to search his trailer was clearly attenuated from any illegality in the initial entry into the trailer, I conclude that the police (whether they "knew" it or not) had sufficient probable cause under exigent circumstances to enter Evans' trailer in search for Owen or in an effort to discover Owen's whereabouts.[1]
The police were aware that a woman had been viciously assaulted in her own home; that she had identified one of her assailants as the "Owen boy"; and that the victim's son knew that Owen had lived at one time with Evans in his trailer. The officers acted reasonably in immediately going to Owen's last known residence (Evans' trailer) to seek Evans' assistance in locating Owen. They were legitimately concerned with apprehending Owen immediately in order to prevent further crimes or his possible escape from the jurisdiction.
When the police arrived at about 2:30 a.m. and observed the unusual behavior (an occupant peered out of the window at them and then turned out the lights), their suspicions were justifiably aroused. Upon knocking, the officers heard movement within the trailer, but did not get any response. At this point, the officers, in the light of the known circumstances, had reason to believe that Owen was the assailant, that he still lived or at least was present in the trailer, and that someone in the trailer was hiding him from the police or was otherwise concealing his whereabouts.
Faced with a situation in which they reasonably believed that immediate action was necessary to locate and arrest Owen, the officers opened the door and entered for that purpose. In doing so, they discovered Owen. The officers nevertheless asked Evans for permission to search before conducting any further intrusion into his privacy, and Evans (who had done nothing wrong and was not criminally involved) voluntarily consented to the search.
This is a very uncomplicated case involving a reasonable and factually supported police response to an emergency situation: a stabbed, sexually assaulted victim identified her assailant, and her son furnished the police with the "last known locale" of that suspect. Police went there, saw that there were occupants (although alerted to the presence of officers) who made no response to their knocks, and made a limited, investigatory entry for the purpose of locating Owen. I do not perceive any illegality in the entry.
DIXON, Chief Justice (concurring in part and dissenting in part).
I respectfully concur in the treatment of Assignment of Error No. 1, but dissent, however, from the treatment of Assignment of Error No. 2. Evans' trailer was the subject of illegal, warrantless entry in the middle of the night. He was roused by armed police officers and told that a person in his house was a suspect in a brutal crime. The police took him into his kitchen while officers stood guard over the others. Even if the police version is correct (that everyone waited around for McCann to arrive before any search took place), this detention alone constituted an arrest and an impermissible invasion of Evans' privacy. Under the circumstances of this case, Evans' consent was the result of exploitation of the previous illegality, and the state has failed to show that it was free and voluntary. State v. Ragsdale, 381 So.2d 492, 497-98 (La.1980). The Fourth Amendment, no less than Art. I, § 5 of our own constitution, "[i]n terms that apply equally to seizures of property and to seizures of persons ... has drawn a firm line at the entrance to the house." Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). To allow Evans' consent in the present case to be *1209 deemed voluntary undermines the respect which this line has always been accorded and invites serious police misconduct.
NOTES
[1] 435 So.2d 454 (La.1983).
[2] 438 So.2d 1269 (La.App.3d Cir. 1983).
[3] 443 So.2d 599 (La.1983).
[4] La. Const. art. 1, § 5 provides:

Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
[5] Because defendants have not alleged or proved that they had a reasonable expectation of privacy in Evans' trailer at the time of the search, they lack standing under the fourth amendment, and, therefore, the fourth amendment is not the basis of our analysis. Rather, defendants have the right to raise the validity of the seizures from Evans' trailer allegedly in violation of Evans' rights under La. Const. art. 1, § 5.
[6] It is arguable that the warrantless, nonconsensual entry was justified by exigent circumstances. A serious, violent crime had just been committed; the items taken were small and could be disposed of easily; the perpetrators might still have blood on their clothes; and, the victim, who was in uncertain condition in the hospital, might not live much longer to identify the suspects. However, given our finding that there was a valid consent search, we need not reach this issue.
[7] This analysis is based on our conclusion that the only violation of Evans' constitutional rights was the entry into his trailer. After the entry, Evans was not the subject of an illegal detention. He was told that he was not the focus of the investigation; he was not handcuffed or told that he was under arrest; and he was not told to remain inside the trailer. Considering these circumstances and the officers' testimony that only Owen would have been prevented from leaving if he had tried, we find that Evans was not arrested or detained. Therefore, State v. Ragsdale, 381 So.2d 492 (La.1980), in which the person who consented to the search was under arrest at the time of the consent, is inapposite. It should be noted that Miller and Church testified that they were arrested soon after the entry. However, even assuming this to be true, this is not relevant to whether Evans was arrested. In determining the validity of Evans' consent, only the violations of his constitutional rights are considered.
[1] The court of appeal unfortunately avoided this issue on the theory that defendants lacked "standing" to object to the search of Evans' trailer where the defendants were spending the night. In doing so, the court of appeal disregarded or inadequately distinguished some of the earlier opinions of this court. See State v. Culotta, 343 So.2d 977 (La.1976); State v. Barrett, 408 So.2d 903 (La.1981).