468 So.2d 617 (1985)
STATE of Louisiana, Appellee,
v.
Nicky D. TAYLOR, Appellant.
No. 16,918-KW, 16,919-KW.
Court of Appeal of Louisiana, Second Circuit.
April 3, 1985.
Rehearing Denied May 3, 1985.
Writ Denied June 28, 1985.
*619 Jack & Hudsmith by Wellborn Jack, Jr., Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., A.M. Stroud, III and John Broadwell, Asst. Dist. Attys., Shreveport, for appellee.
Before HALL, FRED W. JONES and NORRIS, JJ.
NORRIS, Judge.
Defendant, Nicky D. Taylor, was indicted in Caddo Parish for first degree murder. He subsequently moved to suppress various items of evidence seized from his home and pickup truck. After a lengthy hearing, the trial judge took the matter under advisement and rendered a written opinion several months later which suppressed the evidence seized from the pickup truck but denied the motion as to evidence seized from the home. Both the state and defendant applied to this court for writs challenging that decision and we granted both applications to review the correctness of the lower court ruling.
Defendant complains that the lower court erred in concluding that his wife validly consented to a search of the community residence contending that the consent was tainted by the illegality of his arrest and consequently was "fruit of the poisoned tree."
The state contends the lower court erred in suppressing the evidence taken from the pickup truck pursuant to a search warrant. It claims that defendant has failed to overcome *620 the presumption of validity that attaches to a search warrant and, alternatively, that since the officers could have conducted a permissible search of the vehicle on February 12, 1984, they did not lose that right by impounding the vehicle and obtaining an invalid warrant.

FACTS
The evidence introduced at the suppression hearing is voluminous. The trial court's factual conclusions as to what transpired are for the most part amply supported by the record. Where we agree with these factual conclusions, we merely summarize and restate them. Where we disagree we will so state.
On February 10, 1984, the body of Jonathan Sherman was found near the Jimmie Davis Bridge in Caddo Parish. An autopsy revealed the victim died from two bullet wounds to the body.
On Sunday afternoon, February 12, 1984, Bill Gray, an investigator with the Bossier Parish District Attorney's Office, contacted Caddo Parish Chief Deputy Milton Almond and related information he had received from a confidential informant linking defendant with the murder and placing a portable radio/cassette player allegedly belonging to the victim in defendant's home in Bossier City.
Armed with this information, Almond assembled a "task force" of Caddo and Bossier law enforcement officers for a meeting in the Caddo Parish Sheriff's Office. Present at this meeting on the early evening of February 12 were Almond, Gray, J.W. Jones (chief investigator for the Caddo Sheriff's Department), Lt. Scotty Henderson (chief of detectives, Bossier City Police Department), Caddo Deputy Jimmy Crabtree (chief investigator on this particular case), and Caddo Deputy Richard Dunn.
During the meeting the information received by Gray and related to Almond was discussed and radio dispatcher, Doug Robertson, placed what was termed as a "routine" telephone call to the Bossier Parish Sheriff's Office to inquire whether that agency had any outstanding warrants for defendant. In response to the inquiry, Bossier Parish Deputy Sheriff Larry Sherrill checked the warrant file in the radio room and found what appeared to be an outstanding warrant slip. The slip referred to an old bench warrant (February 23, 1981) for failure to appear on an aggravated battery charge and had noted on it, "3-6-81 DA's office requests we hold up on this until 3-9-81 as he is to appear in court on this on that date." Because of the age of the slip and its notation, Sherrill was somewhat dubious of the warrant's validity and informed Robertson that he wanted to check the matter with his shift commander and would call him back. Sherrill could not remember whether or not he in fact checked with his shift commander, but he talked to the radio operator and discovered no further reason to doubt the warrant's validity. Sherrill called Caddo Parish back and confirmed to Lt. Henderson that Bossier Parish did have an outstanding warrant for defendant's arrest and gave Henderson the pertinent information from the slip. Henderson, in turn, relayed this information to the group and the decision was made to arrest defendant on the outstanding warrant.
The evidence conclusively shows that the so-called warrant had in fact been recalled on March 9, 1981, when defendant appeared in court, pled guilty, and paid a fine on the aggravated battery charge. This information was of record and contained on the copy of the warrant slip filed in the Bossier Sheriff's records department. Furthermore, the radio room had been furnished this information via a "dead warrant" memo on March 9, 1981, which should have caused the radio room operators to pull the subject slip from the "active file" and place it in the "dead file." Through error this had not been done.
Nevertheless, armed with the erroneous information Henderson received from Sherrill, the "task force" proceeded to the Taylor home on Kristen Street in Bossier City to arrest defendant. The purpose behind this action was never clearly stated by the officers, but the trial court concluded that *621 the officers "expected to arrest Mr. Taylor on the 1981 warrant ... and to search the home with Mrs. Taylor's consent, or if necessary to obtain a search warrant." This conclusion is amply supported by the evidence.
At the time the officers proceeded to effect defendant's arrest, they did not have probable cause to arrest defendant on the murder charge, nor did exigent circumstances exist.
In route, the help of a uniformed Bossier City Policeman, Kevin Ross, was enlisted by radio and the group arrived at slightly different times in different cars around 9:00 p.m. Ross and Lt. Henderson approached the door and knocked. Nicky Taylor, his wife, Betty Sue Taylor, and a friend, Debra Riley, were inside eating dinner. Defendant answered the door. The officers asked if he was Nicky Taylor and he responded affirmatively. They informed defendant they had a warrant for his arrest for aggravated battery. By this time, Mrs. Taylor and Debra Riley had overheard and approached the doorway. Defendant and his wife told the officers that the aggravated battery charge had been disposed of by payment of a fine and that Mrs. Taylor had the receipt in her purse. This statement did not alter the situation and defendant began to remove items from his pockets and hand them to his wife. Defendant asked to see a warrant and the officers told him he could see it at the police station. Mrs. Taylor grabbed hold of defendant. The officers, according to the unrefuted testimony, then reached inside the residence, took hold of the defendant and pulled him out on the porch where he was handcuffed, frisked and then taken to the Bossier City Jail by Ross and Dunn and booked as a fugitive from Bossier Parish. Ross testified the time shown on the booking sheet, 9:14 p.m., was the actual time of the arrest.[1]
Concurrent with or immediately after defendant's departure, Henderson, Crabtree and Jones gained entrance to the Taylor home. The testimony is conflicting as to whether they were invited in by Mrs. Taylor or were simply admitted entry by her upon their request to talk with her. The evidence does not, however, show a forcible entry.
While Henderson, Crabtree and Jones were in the Taylor residence, Almond and Gray remained outside in the vicinity of their vehicles to assist in any manner necessary.
The testimony as to what actually happened in the Taylor residence between 9:14 p.m. and approximately midnight is conflicting and certainly subject to diverse interpretations.
It is undisputed that Mrs. Taylor was initially upset and crying. She testified that her emotional state never improved because the officers in effect took control over her and her residence and that she simply functioned as a "robot" during the entire evening, obeying their every command. The officers, on the other hand, testified Mrs. Taylor made them coffee, fed them cookies, and cooperated by talking freely about her husband and helping them find the evidence seized. They admit she was upset in the beginning and to some extent throughout the evening, but testified her distress was emotionally caused by the fear that her husband or his family would retaliate against her for being cooperative.
Soon after the officers' entry into the living room, Mrs. Taylor was informed that her husband was a suspect in a murder. The officers requested that they be allowed to talk with Mrs. Taylor alone, and Debra Riley went into the master bedroom. The officers testified Mrs. Taylor talked about the defendant. Mrs. Taylor testified the officers began questioning her concerning her whereabouts and her husband's whereabouts *622 on the date of the murder. The conversation in the living room was interrupted by a telephone call from defendant to his wife. Mrs. Taylor talked to her husband in the living room in the presence of the officers. Thereafter, the subject of the ownership and presence of handguns came up and Mrs. Taylor proceeded to the master bedroom to retrieve two handguns she owned and show them to the officers. Henderson followed her. What happened in the bedroom is the subject of some dispute. Both Mrs. Taylor and Debra Riley testified that after Henderson was shown the two pistols, he took Mrs. Taylor by the arms, told her the officers were investigating a murder, knew she was lying and if she didn't talk with them he could charge her as an accessory after the fact. Henderson did specifically deny he touched Mrs. Taylor in the bedroom but was never asked on direct or cross-examination if he threatened her with arrest in the bedroom. However, all the officers, Henderson included, testified that they never threatened or coerced Mrs. Taylor. Henderson left the bedroom and returned to the living room and Mrs. Taylor and Debra Riley testified they remained in the bedroom for several minutes to allow Mrs. Taylor to regain her composure before returning to the living room. Mrs. Taylor and Debra Riley testified that, as they made their way to the living room, they both could hear loud noises in the attic of the residence.
After the two women rejoined the officers in the living room, Henderson testified Mrs. Taylor told him what her husband had done, started crying, put her arms around his neck; she said she feared for her life at the hands of her husband and his family, and requested help. Henderson stated he patted her on the shoulder and assured her she had nothing to worry about. Mrs. Taylor also attempted to give the officers a recorded statement but the recorder would not work properly. At 10:48 p.m., she signed a consent to search form. The officers testified she signed the form after reading it and that she was in no way threatened or coerced into doing so. Debra Riley's testimony does not indicate any threats, coercion, promises or inducements at the time of the signing of the consent to search and she knew that a permission to search was being signed.
Although the officers testified that the residence was not searched prior to the signing of the consent form, the trial court concluded otherwise and the record supports this conclusion. Both Mrs. Riley and Mrs. Taylor testified the residence was searched before the consent form was signed. In fact, they testified they believed the radio/tape player was found before Mrs. Taylor gave consent. Jones admitted that he went up into the attic to "get a view" but said he "didn't search." Crabtree testified that the search which took place subsequent to the signing of the consent form, lasted about an hour or an hour and a half, and that the radio/tape player was found toward the end of the search. Other evidence, however, shows that Deputy James Hood was called to the scene to take photographs and arrived only a few minutes after 11:00 p.m. Hood testified that shortly after his arrival he was informed that the radio had been found.
All witnesses agreed that Mrs. Taylor's consent to search was not intended to include the pickup truck; yet, while Crabtree and Jones testified that they did not go into the pickup truck that night, this testimony was later shown to have been untrue. Crabtree so admitted. Chief Almond testified he observed Crabtree and Jones go into the truck. His subsequent internal investigation, prompted by the conflicting testimony, revealed that they had indeed done so and that Jones had removed a shotgun from behind the seat, shown it to Crabtree and replaced it.
Henderson, who found the radio/tape player in the attic, testified Mrs. Taylor went into the attic ahead of him and showed him where it was hidden. Mrs. Taylor admits going into the attic with Henderson, a fact really undisputed, but denies she showed him where the radio was. The trial court concluded, and that conclusion is not clearly wrong, that Mrs. *623 Taylor did, in fact, reveal to Henderson the location of the radio.
During the interim between Nicky Taylor's arrest and approximately midnight, the home, attic, garage and, to some degree, the interior of the pickup truck, were searched. The radio/tape player and some clothes were seized from the residence but no items were seized from the pickup truck that Sunday night.
After Lt. Hood arrived, he took photographs of the radio/tape player, clothes, boat and truck. The photographs of the truck were primarily of the tire tread design since Crabtree, upon his arrival, had noticed the unusual design of the tires and tread which matched the tire tracks found at the site where the body was discovered.
Around midnight, Mrs. Taylor left with Mrs. Riley and another friend, Shirley Ledbetter, in Ms. Ledbetter's vehicle, and proceeded to the Caddo Sheriff's Department where she gave a recorded statement. She was not forced to go and was not accompanied or escorted by any police officer.
Shortly after Mrs. Taylor left, a tow truck called by Deputy Almond arrived and towed the pickup truck to the Caddo Parish Sheriff's Academy. Mrs. Taylor knew the truck was going to be impounded and had given the door keys to the officers. She testified she did not have a key to the ignition.
Mrs. Taylor returned home around 1:00 a.m. on February 13 with Ms. Ledbetter and Mrs. Riley. Mrs. Riley spent the night with her. Mrs. Taylor did not visit her husband at the Bossier City Jail that day, made no effort to try to bond him out, and did not present her receipt proving payment of the aggravated battery fine to the authorities. She did not testify that she considered or attempted to seek legal counsel as a result of the activities of the night before. Around 2:00 p.m. on February 13, Henderson, Crabtree and Deputy Strother came back to her residence and again obtained her signature on a consent to search form. The officers testified they did not threaten or coerce her into signing this consent form and that no promises or inducements were made to obtain her consent and signature. The residence was again searched in hopes of finding the victim's glasses and the murder weapon. However, the search turned up nothing.
Later that evening, a warrant was issued for the defendant's arrest for first degree murder and he was arrested and transferred to the Caddo Parish Jail.
Search warrants for the pickup truck, pursuant to Crabtree's affidavit in support thereof, were issued on February 13, 14, and 15, 1984. The warrant issued on the 13th resulted in the seizure of a bullet holder with six live rounds of .380 caliber bullets, vacuum cleaner gleanings from the floorboard and seat and soil samples from the rear wheels. The shotgun that had been handled by the officers was seized pursuant to the February 14 warrant.

ACTION OF THE LOWER COURT
The trial judge, after "considering all the facts and circumstances, and weighing the credibility of the witnesses," found that Mrs. Taylor had validly consented to the search of her residence on the night of February 12, 1984, and he refused to suppress the radio/tape player and clothes seized pursuant to that search. He concluded that the state proved the consent was obtained by means sufficiently distinguishable from the illegal conduct of the officers to be purged of the primary taint. The lower court further refused to suppress evidence of the pickup truck's tires and tire tread design finding that defendant had no legitimate expectation of privacy in his driveway and that the truck and its tires were in plain view. However, it granted the motion to suppress any evidence seized during the interior search of the pickup on the night of February 12 as well as any evidence seized in the search pursuant to the February 13, 1984 warrant.

VALIDITY OF THE ARREST
An analysis of the validity of defendant's arrest is necessary because it will determine whether the entry or intrusion by the *624 officers into the residence shared by Mrs. Taylor was illegal, thus resulting in a violation of her constitutional rights.
Absent "exigent circumstances," the Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution of 1974 prohibit the police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest even if probable cause exists. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); State v. Brown, 387 So.2d 567 (La. 1980); State v. Johnson, 407 So.2d 673 (La.1981).
It is admitted that the officers had no probable cause to arrest defendant in his home for first degree murder and "exigent circumstances" were not present. Thus the legality of defendant's arrest and the subsequent entry into his residence depend upon the validity of the 1981 bench warrant which, in fact, had been recalled.
The trial court found the arrest to be illegal under Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). We agree. In Whiteley, the United States Supreme Court addressed the constitutional requirement of probable cause under circumstances somewhat similar to those present here. In that case, the sheriff of Carbon County, Wyoming, acting on a tip, signed a conclusory complaint reciting nothing more than that Harold Whiteley and Jack Daley unlawfully broke into and entered a building identified as the Rustic Bar in Saratoga, Wyoming on November 23, 1964. A justice of the peace issued an arrest warrant based on the complaint, and the sheriff then issued a police bulletin describing the two men, the type of vehicle they were driving, and the amount and type of money taken in the crime. A police officer in another county, relying on the bulletin, made a warrantless arrest of Whiteley and Daley when he saw them in the described vehicle. The officer searched the vehicle and seized various incriminating items, including some coins taken in the crime. The Supreme Court held that the arrest and the seizure of the evidence incident thereto violated the Fourth Amendment because, first, the complaint was factually insufficient to support an independent judgment that probable cause existed for the warrant and, second, the arresting officer had no information to corroborate the report that the suspect had committed the crime. The court then addressed the state's contention that the police bulletin itself was sufficient to validate the arrest and stated:
We do not, of course, question that the Laramie Police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest. 401 U.S. at 568, 91 S.Ct. at 1037, 28 L.Ed.2d at 313.
While we have found no Louisiana cases precisely on point, the appellate court of Illinois in People v. Joseph, 128 Ill.App.3d 668, 83 Ill.Dec. 883, 470 N.E.2d 1303 (1st Dist.1984), held that good faith reliance on a recalled warrant resulted in an illegal arrest and the evidence seized pursuant to such an arrest was subject to suppression based on Whiteley v. Warden. In Joseph, the state argued that the trial court properly denied defendant's motion to quash the arrest and suppress the evidence because the arresting officer received information through police channels that defendant was wanted on a bond forfeiture warrant on the day of his arrest, and defendant did not tell the officer that the warrant had been vacated or show him a warrant recall slip; and that the "good faith" exception pronounced in United States v. Leon, ___ U.S. ___, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) should apply. The Illinois court rejected the state's argument stating:
*625 We are not convinced that the goodfaith exception recognized by the Supreme Court in Leon is applicable to the case at bar. In that case the Court dealt with evidence seized by police officers acting on a facially valid search warrant which was issued by a state court judge after an independent determination of probable cause. In the case at bar no such safeguard or intervening factor is present.
Rather, the situation here reflects the growing problem evolving from police reliance on electronically recorded and disseminated criminal files. When these computerized records are not kept up to date, a citizen may be subject to a deprivation of his liberty without any legal basis. See discussion in United States v. Mackey, (D.Nev.1975), 387 F.Supp. 1121; 1 LaFave Search and Seizure sec. 3.5(d) (1978), 1 1984 P.P. 176.
In the case at bar the arresting officer received computerized information that there was a warrant outstanding against the defendant and he arrested the defendant solely on that basis. The warrant, in fact, had been recalled 11 days earlier. During this period of time defendant was subject to arrest through no fault of his own, and only because information had been retained in the system when it was no longer valid. See People v. Jennings (1981), 54 N.Y.2d 518, 446 N.Y.S.2d 229, 430 N.E.2d 1282.
In Leon the Supreme Court observed that the exclusionary rule is designed to deter police misconduct rather to punish the errors of judges and magistrates. [citation] The situation in the instant case reflects a matter within the responsibility and control of police authorities who failed to update their records to accurately reflect defendant's current status. In this age of computerization, we do not believe it would be appropriate to sanction the arrest here, thereby allowing law enforcement authorities to rely on an error of their own making. (People v. Lawson, (1983), 119 Ill.App.3d 42, 74 Ill.Dec. 668, 456 N.E.2d 170). Moreover, it is our opinion that the goodfaith reliance of the arresting officer, in acting upon information provided to him through police channels, cannot overcome the intrusion made upon defendant's fourth amendment rights. See People v. Jennings.
* * * * * *
On this record which shows that defendant was arrested solely on the basis of a warrant that had been recalled 11 days prior to the arrest, we conclude that the arrest was invalid, and that defendant's motion to quash his arrest and suppress evidence should have been granted.
In People v. Mitchell, 678 P.2d 990 (Colo.1984), the Colorado Supreme Court reached a similar result holding that a police officer's good-faith reliance upon a purportedly valid but, in fact, void arrest warrant resulted in an illegal arrest and even under Colorado's "good-faith" statute, cocaine seized from the defendant following his arrest pursuant to the invalid warrant must be suppressed. See also, People v. Jennings, supra. Compare State v. West, 408 So.2d 1114 (La.1982), aff'd on remand 437 So.2d 256 (La.1983); and State v. Arceneaux, 425 So.2d 740 (La.1983), on the issue of law enforcement good-faith. It logically follows that once the police authorities have actual knowledge of a fact (here the invalidity of the warrant which the Bossier Parish Sheriff's Office must be charged with because of the information on file in its records department), all successive officers who deal with the defendant are held to have knowledge of this fact.
The lower court did not err in holding defendant's arrest on February 12, 1984, pursuant to the invalid 1981 warrant to be illegal.
The question of the legality or illegality of defendant's arrest on February 12, 1984, is crucial to our analysis of the next issue because it mandates the criteria for measuring the validity of the consent to search.

WARRANTLESS SEARCH OF THE TAYLOR RESIDENCE
Defendant argues the evidence seized from his residence was obtained in violation *626 of his constitutional rights and should be suppressed because his wife did not validly consent to the warrantless search of their residence.
Unquestionably, defendant has standing under both the Federal and Louisiana Constitutions to contest the admissibility of the evidence seized in the search of his residence allegedly conducted pursuant to his wife's invalid consent. The conduct complained of invaded defendant's fourth amendment rights because at the least, he had a reasonable expectation of privacy in his own residence, United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); and under La. Const. art. 1 § 5 as interpreted by our Supreme Court, "any person adversely affected" by a search or seizure allegedly conducted in violation of art. 1 § 5 has standing to raise that illegality. State v. Owen, 453 So.2d 1202 (La. 1984).
We have acquiesced in the lower court's determination that defendant's arrest was illegal. Defendant contends further that the evidence seized from the community residence is inadmissible for use against him at trial since his illegal arrest tainted his wife's consent to search. However, the search and seizure were not conducted as an incident to defendant's arrest, nor is defendant's consent at issue. Further, only defendant's constitutional rights were violated by the illegal arrest itself. However, concurrent with the illegal arrest of defendant was an illegal intrusion or entry into the home which Mrs. Taylor shared. State v. Owen, supra; State v. Summers, 440 So.2d 911 (La.App. 2d Cir.1983). In determining the validity of Mrs. Taylor's consent, only the violation of her constitutional rights are considered. State v. Owen, supra. We further note that the lower court found, and we are in agreement with that finding, that a warrantless search was conducted of the Taylor residence prior to any consent being obtained. This action, likewise, was a violation of Mrs. Taylor's constitutional rights.
Unreasonable searches and seizures are prohibited by both the Fourth Amendment to the United States Constitution and La. Const. art. 1 § 5. A search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well delineated exceptions. State v. Bourgeois, 388 So.2d 359 (La.1980). One of the well-delineated exceptions to the warrant and probable cause requirements is a search conducted pursuant to consent. When the state attempts to rely upon consent to justify the lawfulness of a search, it has the burden of proving the consent was given freely and voluntarily. State v. Wolfe, 398 So.2d 1117 (La.1981). Generally a spouse may consent to the search of a home. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Johnson, 343 So.2d 155 (La.1977). But if the consent was obtained after an illegal detention, intrusion or entry, the consent is valid only if it was the product of a free will and not the result of an exploitation of the previous illegality. Among the factors considered in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the police officers adequately informed the individual that he need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); State v. Owen, supra; State v. Zeilman, 384 So.2d 359 (La.1980); State v. Bennett, 383 So.2d 1236 (La.1980) (on rehearing); State v. Ragsdale, 381 So.2d 492 (La.1980); State v. Mitchell, 360 So.2d 189 (La.1978); State v. Summers, supra. In State v. Bennett the court stated:
Satisfying the Fifth Amendment voluntariness grounds is only the "threshold" condition of Fourth Amendment analysis required by Brown. Dunaway v. New York, 99 S.Ct. at 2260. In Brown, supra, the Supreme Court held that the *627 taint of a confession resulting from an illegal arrest was not purged by Miranda warnings given defendant prior to his arrest. The court stated:
Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, Wong Sun v. U.S. requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 U.S. 471 at 486, 83 S.Ct. 407 at 416, 9 L.Ed.2d 441 [(1963)]. Brown, 95 S.Ct. at 2261.
383 So.2d 1241-42.
In the instant case, the illegal arrest also constituted an illegal intrusion or entry, albeit it slight, into Mrs. Taylor's home; the trial court found that a warrantless search had occurred in the home prior to the obtaining of Mrs. Taylor's consent. The test of Brown v. Illinois, supra, and its progeny must be applied to the instant situation, as the lower court recognized.
Next, we must consider whether, in view of the initial illegality, Mrs. Taylor's consent was a product of her free will rather than an exploitation of the previous illegality. The first factor to consider is whether Mrs. Taylor was adequately informed by the officers that she could refuse the request to search the residence. The lower court found that although the officers did not orally advise Mrs. Taylor of her right to refuse to consent, she did read and sign the consent form when it was presented to her and that she was a college graduate with sufficient education to understand what she read. The evidence will support this finding. The consent form states in part:
I, Betty Sue Taylor having been informed of my constitutional right not to have a search made of the premises and/or vehicle hereafter described without a search warrant and of my absolute right to refuse to consent to such a search ...
Further, the consent form was not signed until some hour and a half after the initial illegal arrest of her husband and the intrusion into her home. Considering the time factor, Mrs. Taylor's education, and all the circumstances present, we conclude that Mrs. Taylor read and understood her right to refuse to consent to the search.
The second factor is the temporal proximity of the illegality and the consent. The consent form was signed some one hour or one and one half hours after the illegal arrest and initial intrusion into the home. Between that time and the signing of the consent, a warrantless search of the residence was conducted. The extent of that search is not clear from the record. We conclude that the time factor in the instant case weighs against the validity of consent. Compare, Brown v. Illinois, supra (consent signed less than two hours from the illegality); State v. Mitchell, supra (consent signed within minutes of the illegality); State v. Bennett, supra (consent signed ten minutes after an illegal search); State v. Owen, supra (45 elapsed time between illegality and consent weighed against validity).
The third factor is whether there were any significant intervening circumstances between the illegal entry and Mrs. Taylor's consent. We first note that the arrest of Mr. Taylor was peaceful. There was no invasion of the home and no struggle. Soon after the illegal intrusion, Mrs. Taylor either invited the officers in or admitted them to her residence. She was not detained, arrested nor was her movement restricted. She obviously talked to and cooperated with the officers. She talked to her husband and Mrs. Ledbetter on the telephone. She made coffee for the officers. She obviously knew that the illegal arrest and subsequent search were not directed at her but at her husband, who was the suspect. She had one friend present from the beginning and a second friend arrived around 11:00 p.m. Mrs. Taylor is a college graduate, a nurse and an intelligent *628 person who knew that the initial arrest was obviously a mistake, yet she never, insofar as the record reveals, produced her receipt to prove the aggravated battery charge for which her husband had been arrested had been disposed of. She had the capacity to understand the clear, concise and unambiguous language on the consent to search form. This factor does not seem to weigh in favor of either the state or the defendant.
The final factor is the purpose and flagrancy of the official misconduct. Although no violation of a citizen's constitutional rights is to be condoned, the issue is, considering the purpose and flagrancy of the illegality, whether there is a close causal connection between the official misconduct and the subsequent consent. The officers in this case made a warrantless intrusion into the Taylor home at the time of the illegal arrest. However, they knocked on the door, did not invade the premises and there was no struggle involved in Mr. Taylor's arrest. Additionally, at that time they believed they were acting pursuant to a valid warrant. The initial intrusion was slight. Thereafter, Mrs. Taylor, though upset because her husband had been arrested, allowed the officers to enter to discuss the problem. That entry was not made to arrest or detain Mrs. Taylor and she was never arrested, detained, nor was her movement restricted. She was soon informed by the officers that her husband was a suspect in a murder trial. The officers testified they did not threaten Mrs. Taylor in any way and the trial judge exercised his great discretion as to credibility and believed the officers on this point. His credibility assessment is entitled to great weight. The search of the residence prior to Mrs. Taylor's consent was illegal, but Mrs. Taylor was cooperating with the officers and there is no evidence that she complained, requested them to stop or asked them to leave the premises. She showed them her handguns and she answered their questions. She read and signed the consent to search form which clearly explained her right to refuse any search. In sum, considering Mrs. Taylor's knowledge of the purpose of the officers' entry into her home and all the attendant circumstances, we conclude, as did the lower court, that the official misconduct had a less than significant effect on Mrs. Taylor's subsequent consent. More than likely, the knowledge that her husband was a murder suspect was more upsetting to Mrs. Taylor than what transpired in the house as a result of the officers' presence.
Should our inquiry end at this point, however, we confess we would be severely strained, based on the application of the law to these facts, to uphold the trial court's conclusion that the consent to search signed at 10:48 p.m. was not the result of an exploitation of the previous illegality. However, it is not necessary for our inquiry to end at this point.
After the consent to search form was signed, Mrs. Taylor voluntarily went with two friends to the sheriff's office and gave a recorded statement. She was not made to go and she was neither escorted nor accompanied by police officers. At the hearing on the motion to suppress, she read over that statement and admitted that she said nothing therein to indicate she had been harrassed, threatened or subjected to any type of illegality during the events of the previous evening. She was neither arrested nor detained but was allowed to return home accompanied by her two friends. She undoubtedly knew at this time that she was not a suspect or the focus of the investigation. Mrs. Riley spent the night with her. She testified she did not go to visit her husband in the Bossier City Jail the next morning even though she knew where he was. She did not attempt to get him released on bond. She did not present to the authorities the receipt that cleared her husband of the charge that had caused his arrest the night before. She admitted making no effort to protest or undo the events of the night before, the very events which she denounced at the hearing on the motion to suppress.
In hopes of finding the victim's glasses and the murder weapon, Officers Crabtree *629 and Henderson, with Deputy Ron Strother, returned to the Taylor residence on February 13, 1984 at 2:00 p.m., some thirteen hours after Mrs. Taylor herself had returned home. They presented Mrs. Taylor with another consent to search form. This form again stated in simple language that she had been informed of her constitutional right not to have a search made of the premises, that knowing of this right she willingly gave her permission to Henderson and Crabtree to conduct a complete search of the premises, and that the permission was given voluntarily and without any threats or promises of any kind. Mrs. Taylor read and signed this second permission to search her residence at 2:30 p.m. on February 13. Crabtree and Henderson testified that no threats or promises were made to secure this permission to search. Another search was conducted of the residence but nothing was discovered or seized.
When we apply the four relevant factors discussed above to this latter manifestation of consent by Mrs. Taylor, we find that the circumstances weigh heavily in favor of finding that this consent was free and voluntary and not the result of an exploitation of any previous illegality. We further conclude that under the jurisprudence the consent of February 13 validated not only the resultant search but also the earlier, warrantless entry, as well as the searches and seizures of the residence that occurred the previous night. In State v. Williams, 353 So.2d 1299 (La.1978), cert. denied 437 U.S. 907, 98 S.Ct. 3098, 57 L.Ed.2d 1138 (1978), the issue of a prior illegal search and a subsequent voluntary consent was before the court and it stated:
Therefore, even if the initial entry into defendant's house ... resulted in a warrantless search or seizure, the subsequent voluntary, written consent to search a second time amounted to a waiver of the warrant requirement rendering both the first and second searches and seizures valid ... 353 So.2d at 1305
See also, State v. Kimble, 375 So.2d 924 (La.1979); State v. Bennett, supra; State v. Henry, 440 So.2d 872 (La.App. 2d Cir. 1983).
Additionally, the circumstances leading up to and surrounding the consent of Monday, February 13, including the actions of Mrs. Taylor after signing the first consent the previous evening, lend solid support to the trial judge's conclusion that Mrs. Taylor did in fact voluntarily cooperate with the officers and validly consent to the search of her residence on the night of February 12, 1984.
The voluntariness of consent is determined only after a review of the totality of facts and circumstances surrounding the giving of consent. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The trial judge's factual determination as to the voluntary nature of the consent to search is entitled to great weight since it assesses the credibility of witnesses he had the opportunity to hear and observe. State v. Martin, 376 So.2d 300 (La.1979), cert. denied, 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297 (1980), rehearing denied, 449 U.S. 1119, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981).
For the foregoing reasons, we affirm the lower court's ruling denying the motion to suppress the items seized from defendant's residence.

VALIDITY OF SEARCH OF DEFENDANT'S PICKUP TRUCK
The lower court refused to suppress evidence of the pickup truck's tires and tire track designs, justifying their admissibility on the basis of the "plain view" exception to the warrant requirement. Defendant does not assign this ruling as error. Therefore, we do not address it. However, the lower court suppressed all evidence seized as a result of the search of the truck's interior, begun at noon on February 13, 1984. The state complains of this ruling.
The interior of the truck was searched pursuant to a search warrant issued February 13, 1984 by a district judge on the strength of an affidavit in support thereof *630 by Deputy Crabtree. In the affidavit, Crabtree swore, "[T]his vehicle was removed to the Caddo Sheriff's Academy without touching or misplacing anything in the vehicle." At the motion to suppress, the evidence conclusively showed that both Crabtree and Deputy Jones had in fact gone into the truck, that Jones had removed the shotgun, showed it to Crabtree and then replaced it in the truck. Prior to this revelation, Crabtree and Jones both testified they did not search the inside of the truck. The trial judge expressly found that a search of the interior of the truck did in fact occur on the evening of February 12, 1984. Thus, the affidavit contained intentional misrepresentations of fact. The apparent motive behind these misrepresentations was to prevent the magistrate from learning of a possible illegal search of the truck. The affidavit also misrepresented the actual occurrences of the night of February 13, 1984, as well as the chronological order of the events described.
Because intentional misrepresentations of fact contained in an affidavit in support of a search warrant constitute a fraud upon the courts and represent impermissible overreaching by the government, a warrant based on an affidavit containing intentional misrepresentations must be quashed. State v. Rey, 351 So.2d 489 (La. 1977); State v. Lamartiniere, 362 So.2d 526 (La.1978). We agree with the lower court that the search warrant issued February 13, 1984, as well as subsequent search warrants for the truck, issued pursuant to the same affidavit, are invalid. Therefore, the search of the truck on February 13, 1984, stands on no firmer ground than if there had been no warrant at all. If the search and seizure of the vehicle on February 12, 1984 and the search beginning at 12:00 noon on February 13, 1984, are to be justified, they must be justified on some other theory. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), rehearing denied 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971); State v. Westfall, 446 So.2d 1292 (La. App.2d Cir.1984), writ denied, 450 So.2d 957 (La.1984).
Searches conducted outside the scope of the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment of the United States Constitution and Article I § 5 of the Louisiana Constitution of 1974, unless they fall within a limited number of well delineated exceptions to the warrant requirement. Coolidge v. New Hampshire, supra; State v. Guzman, 362 So.2d 744 (La.1978), cert. denied 443 U.S. 912, 99 S.Ct. 3103, 61 L.Ed.2d 876 (1979). Absent a warrant, the state has the burden of proving that the search is justified by one of the exceptions to the warrant requirement. State v. Redfearn, 441 So.2d 200 (La.1983).
The lower court concluded that although Mrs. Taylor probably had the authority to consent to a search of the pickup truck, the consent to search she signed at 10:48 p.m. on February 12, 1984 was not intended to include the pickup truck. The consent to search signed on Monday, February 13, 1984 covered "all buildings and vehicles, both inside and outside of the property located at 5707 Kristen St., Bossier City, La." We note, however, that when this consent to search was signed the truck was not located on the premises. Thus, the consent to search exception is not applicable.
The only possible exception applicable here under the circumstances is the "automobile emergency" exception. See Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), rehearing denied, 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970); State v. Guzman, supra; State v. Redfearn, supra.
In order for a warrantless search of a vehicle to be constitutional, two conditions must be met: (1) there must be probable cause to believe that the vehicle contains contraband or evidence of a crime, and (2) there must be exigent circumstances requiring an immediate search. Chambers *631 v. Maroney, supra; State v. Guzman, supra. Furthermore, when police officers have probable cause to believe there is contraband inside an automobile that has been stopped or found parked and exigent circumstances exist, they may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody. Chambers v. Maroney, supra; Texas v. White, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975), rehearing denied 423 U.S. 1081, 96 S.Ct. 869, 47 L.Ed.2d 91 (1976); State v. Guzman, supra; State v. Lain, 347 So.2d 167 (La.1977); State v. Redfearn, supra. In other words, given that a warrantless search on the scene would have been constitutional, the later search at the police place of impoundment is also constitutional. State v. Redfearn, supra.

PROBABLE CAUSE
Earlier we noted that Chief Almond had received a tip from a confidential informant that defendant was involved in the murder and that evidence could be found in his home. Certainly, with this information, even absent a valid warrant for defendant's arrest, officers had a right to locate defendant's residence and go there for an investigatory view. The pickup truck was parked, not in the closed garage, but in the driveway only a few feet from the sidewalk in front of the house. From the street and sidewalk, Crabtree observed the truck and its tires. Several days earlier, while at the scene where the victim's body was found, Crabtree and Hood had opined that the victim was brought there in a vehicle with an unusual combination of tires with a markedly distinctive tread design. The tracks at that site indicated the rear tires of the vehicle were mudgrips and the front tires were radials with one large one inch tread in the center. Hood and Crabtree testified that the combination of tires and tread design was unusual and unique. In fact, Hood testified that he had seen no combination of rear and front tires like the tracks found at the scene and on defendant's pickup truck in looking at hundreds since the initial investigation.
After Crabtree noticed the unusual combination of tires from a distance, he went up into the driveway for a closer look. There, he reached the decision that the tread design and combination of tires were strikingly similar to the tracks he had observed with Hood at the site where the victim's body was found. After Hood arrived, he examined the tires on the truck, which was still in the driveway, and was of the opinion that the tires on the truck were the same unusual combination and design that produced the tracks found near the victim's body. Hood testified that because of the unusual combination and design of the tires, this opinion was not difficult to reach.
In State v. Brown, 395 So.2d 1301 (La. 1981), the court held that a defendant did not have a reasonable expectation of privacy in the driveway area of his residence. In Brown, defendant's residence was in a rural area and the driveway from the road was 100-150 feet long. However, the property was not fenced, there was no gate closing the driveway and there was nothing to suggest that visitors or the authorities were to be denied easy access. The court stated:
The test for determining whether one has a reasonable expectation of privacy is not only whether the person had an actual or subjective expectation of privacy, but also whether that expectation is of a type which society at large is prepared to recognize as being reasonable. State v. Wilbourn, 364 So.2d 995 (La.1978); State v. Dupuis, 378 So.2d 934 (La.1979). [State v. Ragsdale, 381 So.2d 492, 497 (La. 1980).]
Given the above facts, even though not a public area, the defendant [sic] could not have reasonably expected the driveway of his residence to have privacy from public view. Since there was no intrusion into defendant's privacy, the evidence was legally obtained and properly admitted. * * *
395 So.2d at 1311
*632 Here, because of the truck's position only a few feet from the sidewalk, there was obviously no attempt to hide it from public view. The defendant could not have reasonably expected the driveway of his residence to have privacy from public view and there was no intrusion into defendant's privacy when the officers observed the truck from the street, sidewalk and subsequently in the driveway. As stated in Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), "[W]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."
Using a "totality of the circumstances analysis" as prescribed by Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), we believe that the confidential informant's tip coupled with the unexpected discovery of the pickup truck's unusual tires and tire tread design which were distinctively similar to the tracks found near the victim's body, created probable cause for Crabtree and Hood to believe that this was the vehicle used to transport the murder victim to the place where his body was dumped and that additional contraband or evidence of the crime was contained on and in the truck.

EXIGENT CIRCUMSTANCES
Although defendant had been arrested and removed from the premises, the offense for which he had been arrested was bondable. Furthermore, defendant's wife was not arrested; she was allowed to remain at the residence, alerted to the fact that defendant was a murder suspect and that the pickup truck was of interest in the investigation. The pickup truck was accessible to Mrs. Taylor, who could have moved it or removed evidence from it. We conclude the officers were faced with exigent circumstances. They could have searched the vehicle immediately at the scene. However, because of the nature of the evidence Hood wished to gather, i.e., fingerprints, vacuum gleanings, dirt samples, hair and measurement of tires, and because of the special equipment necessary to retrieve it, he decided the best course was to have the vehicle towed to the police academy. Otherwise, the evidence might have been destroyed by carelessness at the scene. We think these circumstances created a reasonable basis for moving the vehicle to the Sheriff's Academy.
The officers had justification to conduct a warrantless search of the vehicle on the premises. Such justification does not vanish once the car has been immobilized or impounded. Chambers v. Maroney, supra; Texas v. White, supra; Michigan v. Thomas, 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982); Florida v. Meyers, ___ U.S. ___, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984); State v. Guzman, supra; State v. Lain, supra; State v. Redfearn, supra.
We conclude the trial court was in error in suppressing the evidence seized in the search of the vehicle on Monday, February 13, 1984. It was a valid search under the "automobile emergency" exception to the warrant requirement.
We do not, however, by our decision here, intend to convey the impression of condoning or approving the actions of some of the officers involved in this case. We share the lower court's consternation at the reprehensible and uncalled for acts of these sophisticated and highly trained officers. Blatant warrantless searches and fraudulent affidavits cannot be tolerated even though in rare instances, as here, they fall short of actually violating the rights of an accused.
For the foregoing reasons, the lower court ruling denying the motion to suppress items seized from defendant's residence on February 12, 1984, is affirmed; the ruling granting the motion to suppress items seized from defendant's truck pursuant to a search conducted February 13, 1984, is reversed. The matter is remanded to the lower court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
NOTES
[1] At this point, we note that Bossier Parish was never advised by Bossier City of Caddo Parish that their "fugitive" had been arrested on the 1981 warrant. However, we also note that on the following Monday evening, defendant was arrested and charged with murder and transferred to the Caddo Parish Jail.